GEORDIE DUCKLER, OSB #873780
9397 SW Locust St.
Tigard, Oregon 97223
Telephone: (503) 546-8052
Facsimile: (503) 241-5553
geordied@animallawpractice.com

RILEY SAFER HOLMES & CANCILA LLP
BRUCE WAGMAN (CSB #159987) (*pro hac vice* application pending)
456 Montgomery Street, 16th Floor
San Francisco, CA 94104
bwagman@rshc-law.com
P:      (415) 275-8540
F:      (415) 275-8551

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| CENTRAL OREGON WILD HORSE COALITION, a non-profit organization; GAYLE HUNT, an individual, MELINDA KESTLER, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>TOM VILSACK, in his official capacity as Secretary of the U.S. Department of Agriculture;<br><br>RANDY MOORE, in his official capacity as Chief of the U.S. Forest Service;<br><br>GLENN CASAMASSA, in his official capacity as Regional Forester, Pacific Northwest Region of the U.S. Forest Service;<br><br>SHANE JEFFRIES, in his official capacity as Forest Supervisor of Ochoco National Forest of the U.S. Forest Service,<br><br>Defendants. | Case no.<br><br>COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF<br><br>Administrative Procedure Act Case<br><br>JURY TRIAL DEMANDED |

1

## INTRODUCTION

1.	The U.S. Forest Service ("USFS" or "Forest Service") is legally mandated to protect and preserve the wild horses of the Ochoco National Forest ("Ochoco Herd" or "Herd"). In violation of that core responsibility, the Forest Service has acted decisively to plan the irretrievable loss of genetic viability, adaptedness, and identity of the Herd, which will lead to their ultimate extinction as a distinct entity. USFS's decision should be vacated.

2.	Defendants, who are responsible for the well-being and continued health and welfare of the Herd, have decided to remove nearly two-thirds of the wild horses currently living in the Big Summit Territory as members of the Ochoco Herd. Defendants' decision will lead to the decimation of this unique herd. Plaintiffs Central Oregon Wild Horse Coalition, Gayle Hunt, and Melissa Kestler (collectively "Plaintiffs") seek vacatur of that decision given its likelihood of permanent harm to this important herd.

3.	The Forest Service's May 7, 2021 Decision stating its planned roundup and drastic reduction of Ochoco Herd horses was issued in violation of its obligations to take a "hard look" at the impacts of its decision. It did not consider important and undisputed evidence, and the Decision puts the agency in direct conflict with its obligations under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the Wild Free-Roaming Horses and Burros Act, 16 U.S.C § 1331 et seq. ("Wild Horse Act"), and the Administrative Procedure Act ("APA"), 5 U.S.C § 70.

## JURISDICTION AND VENUE

4.	This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C § 702.

5.  Venue is proper in the District of Oregon under 28 U.S.C. § 1391(e)(1)(C). This civil action is brought against officers of the United States acting in their official capacities, and venue is proper in this district because Plaintiffs reside in this district and no real property is involved in the action. *Id.* Plaintiffs come to the Ochoco National Forest area, in particular the Big Summit Wild Horse Territory, for the express purpose of seeing, enjoying, and photographing the Ochoco Herd and engaging in other vocational, scientific, spiritual, and recreational activities specifically relating to the Herd.

6.  An actual, justiciable controversy exists between the parties, and the requested relief is therefore proper under 28 U.S.C. § 2201, *et seq.* This Court may review Defendants' actions and order appropriate relief under the APA, the Wild Horse Act, and NEPA.

**PARTIES**

7.  Plaintiff Central Oregon Wild Horse Coalition (hereinafter "COWHC") is a 501(c)(3) nonprofit wild horse conservation organization based in Oregon, that is dedicated to the protection of wild horses residing in Big Summit Wild Horse Territory.

8.  The stated mission of COWHC is the promotion of "the welfare of wild horses in the Ochoco Mountain environment; for them to be safe and free including support for adequate forage, water and shelter; sufficient number to ensure genetic viability ..., and elimination of all crimes and harassment against them." COWHC exists to "secure the long-term welfare" of the Ochoco horses in the Big Summit Wild Horse Territory.

9.  Before the Decision was issued, COWHC consistently utilized its limited resources to organize around, educate about, and advocate for the Ochoco Herd, promoting adoptions, providing educational programs and performing other outreach activities directed at the protection of the Ochoco Herd and other wild horses. Its members also participated in virtually all public

meetings regarding the Herd, provided comments to proposals by the Forest Service that would impact the Herd, and organized support for the Herd on a regular basis.

10.     Because of the Decision, though, and since 2017, COWHC has almost completely had to cut back on its regular programs and divert its resources towards the actions of Defendants with respect to the Ochoco horses. The funds, time, and effort, that COWHC has dedicated to trying to stop USFS from engaging in the actions it seeks to carry out through its Decision directly impact the way COWHC would have otherwise spent such resources, including on adoptions, educational programs, genetic and ecological research, and other donor development to benefit wild horses.

11.     USFS's plan to round up and permanently impact the Ochoco Herd's survival is antithetical to COWHC's mission and will directly the harm the organization's ability to continue to carry out its work.

12.     A court order declaring unlawful USFS's plans to drastically reduce the Ochoco Herd would protect COWHC's interests in the humane treatment, safety, and continued health and viability of wild, free-roaming horses and will allow COWHC to dedicate its limited resources to its core mission and improve conditions for wild horses in the Ochoco National Forest.

13.     Plaintiff Gayle Hunt is a resident of Prineville, Oregon and for many years has advocated for the preservation and protection of wild horses, including those in the Ochoco National Forest. She regularly visits the Ochoco National Forest and enjoys observing, recording, photographing, and studying the wild horses living there and their habitat.

14.     Ms. Hunt derives substantial recreational and aesthetic enjoyment from observing these wild horses and the public lands on which they live, and she has emotionally bonded with these horses in a deeply personal way.

15. Because Ms. Hunt recognizes the unique nature of the Ochoco Herd, and the Forest Service's actions will destroy the Herd's genetic identity, Ms. Hunt has an intense interest in ensuring that the horses are protected and conserved in their current state.

16. Over the last forty years, Ms. Hunt has been interested in the USFS's management of wild horses and has monitored and advocated for the welfare of the wild horses in the Ochoco National Forest.

17. Ms. Hunt has lived in close proximity to the Ochoco National Forest for almost thirty years and was employed by the USFS for twenty-seven years. For a decade during those years, Ms. Hunt lived at the former Ochoco Ranger Station located within the Big Summit Wild Horse Territory as a USFS employee and spent every day in the same habitat as the Ochoco Herd. Ms. Hunt has adopted Big Summit horses herself, gentled many others for adopters, and intervened in failed adoptions to assure future successful ones. Ms. Hunt also has rescued or assisted in the rescue of injured or at-risk Big Summit horses and has assisted in the euthanasia and forensics investigations of their deaths.

18. In 2002, along with other individuals with similar interests in the Ochoco Herd, Ms. Hunt formed the COWHC to promote proper management of the Ochoco Herd, and to ensure their health, safety and welfare.

19. On her regular visits to the Ochoco National Forest, Ms. Hunt recognizes certain individual horses of the Ochoco herd and is familiar with the majority of the herd. The ability to view those horses when she visits provides her with important recreational and aesthetic value as well as subject content for artwork and stories for young readers. Ms. Hunt will continue to visit, observe and photograph the Ochoco Herd for as long as she can, provided they are not permanently altered by the actions of the Forest Service.

20. Ms. Hunt recognizes the special nature of the Ochoco horses, who have a temperament that is noticeably different than that of other wild horses, and that will be diluted and destroyed by Defendants' plan to introduce horses from outside of the Ochoco National Forest to interbreed with the current Ochoco Herd.

21. Ms. Hunt's personal, aesthetic, and recreational interests in the Ochoco Herd and the public lands on which they live are and will be severely impaired by the USFS's Decision at issue in this case.

22. Plaintiff Melinda Kestler is a resident of Prineville, Oregon, in close proximity to the Ochoco National Forest. Ms. Kestler has been coming to Central Oregon since 2002 and moved to Prineville in 2006 specifically to be close to the Ochoco Herd.

23. Ms. Kestler has been involved with horses her entire life and has been tracking the management of the Ochoco Herd for close to two decades.

24. Ms. Kestler has been visiting the Ochoco Herd on a consistent basis since 2006, during all times of year. She intends to continue that practice as long as there are horses in the Ochoco National Forest.

25. Between 2015 and 2018, Ms. Kestler engaged in aerial observations and counting of the Ochoco wild horses, the results of which were provided to Defendants.

26. Ms. Kestler has been a volunteer rider for the Ochoco Herd census counts organized by COWHC in coordination with the USFS.

27. In coordination with, and with the authorization of, the USFS, Ms. Kestler has been involved in the rescue of Ochoco wild horses in need of assistance.

28. In collaboration with USFS, Ms. Kestler has been involved with a number of committees and working groups, addressing issues with the Ochoco Herd in collaboration with the

USFS: The Wild Horse Working Group (Dec. 2015 – July 2017); The Wild Horse Working Group subcommittee, referred to as the "Co-chair Group" (Sept. 2016 – July 2017); and The Wild Horse Sounding Board (Nov. 2017 – May 2018). Ms. Kestler also has served as the Chair of the Crook County Natural Resource Plan Development Ochoco Wild Horse Committee (Jan. 2016 – Present) and was responsible for composing the Wild Horse section of the Crook County Natural Resource Plan that the Crook County Court adopted in November 2017.

29. Ms. Kestler has adopted four horses from USFS that were removed from the Ochoco National Forest.

30. Ms. Kestler's personal, aesthetic, and recreational interests in the Ochoco Herd and the public lands on which they live will be severely impaired by the USFS's Decision at issue in this case.

31. If Defendants' actions are not carried out and the Ochoco Herd is not decimated by the planned roundups, Ms. Kestler will be able to continue her decades-long work and relationship with the Herd.

32. Defendant Tom Vilsack is Secretary of the U.S. Department of Agriculture ("USDA"), the parent agency for the USFS, and is ultimately responsible for the Ochoco Herd and USFS's Decision. He is sued in his official capacity.

33. Defendant Randy Moore is Chief of the USFS and is responsible for the Ochoco Herd and USFS's Decision. The USFS is an agency within USDA that is responsible in part for the protection and management of wild horses under the Wild Horse Act. The Wild Horse Act authorizes USFS to maintain ranges on public lands as sanctuaries for the protection and preservation of wild horses. 16 U.S.C. § 1333. He is sued in his official capacity.

34. Defendant Glenn Casamassa is USFS's Regional Forester for the Pacific Northwest Region, which includes the Ochoco National Forest. He is responsible for the Ochoco Herd and USFS's Decision. He is sued in his official capacity.

35. Defendant Shane Jeffries is the USFS Forest Supervisor of the Ochoco National Forest. He is charged with managing the public land and resources of the Ochoco National Forest in accordance and compliance with federal laws and regulations. The Lookout Mountain and Paulina Ranger Districts of the Ochoco National Forest prepared the Environmental Assessment and other documentation for and authorized the Decision affecting wild horses from the Ochoco Herd. He is sued in his official capacity.

## BACKGROUND

### A.     The Ochoco National Forest

36. The Ochoco National Forest consists of nearly 846,000 acres of public forest land situated in the Ochoco Mountains in Central Oregon and is home to the wild horses residing in Big Summit Wild Horse Territory ("Territory").

37. The Territory is inviting, accessible, and popular with many members of the public. It is home to numerous and varied animal species, both wild and domesticated, including domestic sheep grazing under government permits in the summer months. Environmentally, the Ochoco National Forest – as the primary watershed for downstream flows needed for irrigation, wildlife and fisheries, and recreation – receives substantial snowfall during winter.

### B.     Population Sizes: historically and present day

38. In 1975, the "Big Summit Wild Horse Territory Management Plan" (the "1975 Plan") assigned an appropriate management level (population range) for the Ochoco Herd of 55-65 animals.

39. In 1989, the Ochoco National Forest Land and Resource Management Plan stated that the population of wild horses in the Big Summit Ranger District should not exceed sixty horses.

40. The most recent census of the herd was conducted in 2019 using approximately 70 volunteer riders stationed across the horses' range of use, which historically has far exceeded Territory boundaries. 125 horses were counted with evidence of five unseen horses sufficient to bring the likely number to 130.

41. Since approximately 2013, COWHC estimates that the Ochoco Herd population has fluctuated between 120 and 152 horses.

42. The 1975 Plan has remained in force until the Decision was issued on a revised Ochoco Wild Horse Territory Management Plan, with a revised Appropriate Management Level ("AML") of 47-57 horses.

43. The Forest Service admits that its proposed AML for the Ochoco Herd "is inadequate to prevent genetic depression." EA, Appx. B, at 214.

## LEGAL FRAMEWORK

### *Administrative Procedure Act (APA)*

44. The APA provides for judicial review of final agency action for persons adversely affected or aggrieved by the agency action. 5 U.S.C § 702.

45. The APA authorizes this reviewing Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (C), and (D).

9

46. If a federal agency such as USFS implements a new position which deviates from the status quo, the new position is deemed arbitrary or capricious unless the agency displays awareness that it has changed its position and provides a reasoned explanation for why it believes the new position is better than its previous position. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

### *National Environmental Policy Act*

47. The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, is "intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process." 40 C.F.R. § 1500.1(a).

48. In enacting NEPA, Congress "recogniz[ed] the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances[.]" 42 U.S.C. § 4331.

49. In order to carry out the congressional declaration of NEPA's policy, the Federal Government is continually responsible to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations; assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings; attain the widest range of beneficial uses of the environment without . . . undesirable and unintended consequences; [and] preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice." 42 U.S.C. § 4331(b)(1)-(4).

50. NEPA's purposes encompass "[promoting] efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man" and

"[establishing] a Council on Environmental Quality" ("CEQ") charged with "formulat[ing] and recommend[ing] national policies to promote the improvement of the quality of the environment." 42 U.S.C. §§ 4321, 4342.

51. The CEQ regulations implementing NEPA mandate that "[f]ederal agencies. . . use all practicable means and measures to foster and promote the general welfare, create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 40 C.F.R. § 1500.1.

52. CEQ regulations define the term "major federal action:"

> "Major Federal action" may include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by Federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals. . . .

40 C.F.R. § 1508.1(q)(2).

53. Where an agency is invoking a new procedure or program, such as the proposed herd reduction action here, NEPA review is required before that program can be invoked.

54. An environmental "effect" is defined in CEQ regulations to encompass both direct and indirect effects and impacts, including but not limited to ecological, aesthetic, historic, cultural, economic, social, or health effects, whether direct, indirect, or cumulative. 40 C.F.R. § 1508.1(g).

55. NEPA requires all federal agencies to prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This statement is referred to as the Environmental Impact Statement ("EIS").

56. The existence of any one of the CEQ significance criteria usually requires the preparation of an EIS.

57. An EIS ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast. *Id.*

58. Where the significance of environmental effects is unclear, the agency may first prepare an EA, which must "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact (FONSI)." 40 C.F.R. § 1501.5.

59. Federal agencies must carefully consider relevant detailed information concerning significant environmental impacts and share that information with the pubic in the Environmental Assessment. NEPA procedures must ensure that federal agencies have considered relevant environmental information and that the public has been informed before decisions are made and before actions are taken. 40 C.F.R. § 1500.1.

### *Wild Free-Roaming Horses and Burros Act*

60. In 1971, Congress declared that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene." 16 U.S.C. §§ 1331 *et seq.*

61. The Wild Horse Act provides, *inter alia*, that viable herds of wild horses should remain on the lands on which they were found at the time the Wild Horse Act was passed, "as an

integral part of the natural system of the public lands." *Id.* That is, barring compelling reasons to the contrary, wild horses are entitled to stay in their "herd area" — the "geographic area identified as having been used by a herd as its habitat in 1971." 43 C.F.R. § 4700.0-5(d).

62. Congress delegated to the Secretary of Agriculture and the Secretary of the Interior jurisdiction over all wild free-roaming horses and burros "for the purpose of management and protection." 16 U.S.C. § 1333(a).

63. Congress requires the agencies involved to preserve and safeguard the horses in a manner that causes the horses the least amount of interference. The Wild Horse Act provides that "[a]ll management activities shall be at the minimal feasible level . . . in order to protect the natural ecological balance of all wildlife species which inhabit such lands, particularly endangered wildlife species." *Id.*

64. If USFS determines, based on reliable information, that there is an "overpopulation" of wild horses on public land, and only if the removal of "excess" animals is necessary, the USFS is entitled to remove them. *Id.* § 1332(b)(2). The agency can only take animals out of the herd who "*must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area.*" *Id.* § 1332(f) (emphasis added).

## FACTS GIVING RISE TO PLAINTIFFS' CLAIMS

### *The Decision Will Reduce the Ochoco Herd to a Dangerously Low AML Level*

65. The Decision ignores the high risk of dropping the population dangerously low, which the Forest Service admits will jeopardize the herd, and where any unexpected environmental setback could lead to the extinction of the Herd.

66. The AML has been developed on the premise of available forage for a certain number of horses. The simple relationship of horses to pounds of forage is known as "density

dependence." The alteration of that dependence based on the accessibility of any of the four essential habitat components of forage, water, cover, or space creates "density independence", which the Decision ignores.

67. The Decision improperly designates a winter range for the Herd based on off-site preference studies, random sightings, and inconclusive winter ground surveys. But in reaching the Decision, defendants ignored the Ochoco Herd's documented wide use of the Territory even in harsh winters.

68. The Decision's AML of 47-57 horses improperly assumes that the Herd created the resource damage that the USFS uses to justify its Proposed Action. The objective of providing adequate habitat for a viable population of resident wild horses is paramount, in accordance with the Wild Horse Act, yet this objective has been subjugated to riparian health which can be and should have been addressed through other means.

69. It is inevitable that an occasional catastrophic weather event, expected to be more frequent and severe with a changing climate, will result in significant die-off of wild horses which are unable to leave the Territory. It is inevitable that a low level of heterozygosity indicative of a "bottleneck" event occurring to a population of 47-57 horses, with survivors vulnerable to increasing predation and further genetic concentration, will have a devastating impact on the Herd.

***The Decision Fails to Adequately Assess the Genetic Diversity of the Ochoco Herd***

70. The current genetic health of the Ochoco Herd has not been assessed adequately.

71. Defendants state that the Ochoco horses "are considered as part of the metapopulation of all wild horses in the United States therefore, loss of horses in one territory does not constitute loss of a population." EA, at 10, citing 2013 National Research Council, National Academy of Sciences report "Using Science to Improve BLM's Wild Horse and Burro Program;

A Way Forward" (hereinafter "the 2013 NAS Report"). Defendants' definition of "metapopulation" is inaccurate since the 2013 NAS Report distinguishes a metapopulation as a unit comprised of herds bearing a geographic and genetic relationship, from herds such as Big Summit which is essentially an island population. The Herd is neither adjacent to nor necessarily compatible with, other herds and is not in geographic or genetic proximity to other herds. This improper use of the "metapopulation" term is a proxy for allowing the Forest Service's arbitrary and capricious decision-making with respect to this Herd.

72. In spite of studies showing the necessity of monitoring and maintaining allelic richness as well as heterozygosity, the USFS failed to acquire essential data of both heterozygosity and allele richness for the current population of Ochoco Herd. Instead, the Ochoco National Forest intends to collect this data as the post-decisional process of trapping the horses to achieve AML begins. This critical genetic diversity information should have been collected and considered as part of the Decision. Without this information, the Forest Service is jeopardizing the viability of the herd; its actions are akin to shooting into a home and hoping that no one is inside.

73. The 2013 NAS Report provides specific direction for monitoring and maintaining small herds. The subject decision failed to acknowledge those directions and in fact proposes to limit genetic monitoring and management objectives in express derogation of the 2013 NAS Report.

74. The Ochoco should be considered a truly isolated population and is significantly different from the majority of other wild horse herds. The Decision ignores that genetic diversity can be both improved and increased by a viable population level, frequent monitoring, and that translocation should only be used where necessary, *after* evaluation of both heterozygosity and allelic richness and strength of the herd.

75. The Decision inappropriately mandates capture to 47-57 total horses, with genetic testing accomplished at capture. The Decision also contemplates introducing outside mares into the Ochoco Herd before a preliminary baseline assessment has been conducted and before potential deleterious effects of the aggressive translocation of mares from herds of high differentiation and low adaptation to the Territory have been considered.

## CLAIMS FOR RELIEF

### COUNT ONE

### (Violation of the Administrative Procedure Act)

76. Plaintiffs hereby incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

77. By authorizing Alternative 2 of the Proposed Action and deciding to reduce the Ochoco Herd's AML to 47-57 horses, Defendants have abused their discretion and acted arbitrarily and capriciously and not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (C), and (D).

78. Each and every one of these actions and omissions has injured and damaged Plaintiffs as set forth above.

79. Because Defendants' Proposed Action of reducing the Ochoco Herd's AML violates the language and the spirit of governing law in an arbitrary and capricious manner, Defendants have violated their duties under the APA. Accordingly, USFS's Proposed Action of reducing the AML should be declared unlawful and the EA, Decision, and FONSI should be vacated.

### COUNT TWO

### (Violation of the Wild Free-Roaming Horses and Burros Act)

80. Plaintiffs hereby incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

81. Defendants' Decision to reduce the Ochoco Herd's AML is unnecessary given other existing population control methods and therefore violates the Wild Horse Act's requirement that Defendants' management activities "shall be set at the minimal feasible level." 16 U.S.C. §1333(a).

82. Defendants' treatment of the Ochoco horses as "considered as part of the metapopulation of all wild horses in the United States" is insupportable, rendering their decision with respect to translocation and genetic diversity arbitrary and capricious and in violation of federal law.

83. Defendants are charged with the responsibility to maintain a healthy wild horse herd and to adhere to all the provisions of the Wild Horse Act requiring maintenance of a viable, self-sustaining wild horse population. The Herd's basic population size must be paramount to any decision. The Decision does not follow that standard and instead violates the most fundamental aspect of both the letter and intent of the Wild Horse Act.

84. Defendants have violated the Administrative Procedure Act and the Wild Horses Act because they have failed to adequately consider less risky alternatives and the lasting and potentially dangerous impacts or reducing the Ochoco Herd to such a low AML.

85. Each and every one of these actions and omissions has injured and damaged Plaintiffs as set forth above.

86. Because Defendants' Proposed Action violates the language and the spirit of governing law in an arbitrary and capricious manner, Defendants have violated their duties under

the Wild Horse Act. Accordingly, USFS's Proposed Action should be declared unlawful and EA, Decision, and FONSI should be vacated.

## Count Three

### (Violation of the National Environmental Policy Act)

87. Plaintiffs hereby incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

88. By authorizing drastic herd reduction without first conducting an environmental review and producing an EIS according to NEPA, 42 U.S.C. § 4332(C) *et seq.*, and by issuing a FONSI concluding that their actions could not possibly have any significant impacts, Defendants have violated NEPA and CEQ's implementing regulations, and have acted arbitrarily and capriciously, and without observance of procedure required by law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2) *et seq.*

89. Under NEPA, agencies are obligated take a "hard look" at all the consequences, environmental impacts, and adverse effects of their proposed actions. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).

90. Defendants failed to adhere to NEPA's "hard look" mandate because the Decision failed to consider and analyze the potential direct, indirect, and cumulative effects to wild horses that will result in the proposed reduction of the current wild horse population.

91. The EA fails to fully analyze all the environmental and other impacts that Defendants are forcing onto the Herd, with potential significant consequences. Without a complete analysis accounting for all potential significant impacts, the EA violates NEPA.

92.     Defendants' decision to proceed with the Proposed Action of reducing the Ochoco Herd's AML before preparing an EIS violates both NEPA and CEQ's regulations as set forth above.

93.     Each and every one of these actions and omissions has injured and damaged Plaintiffs as set forth above.

94.     USFS's Proposed Action should be declared unlawful and the EA, Decision, and FONSI should be set aside.

## RELIEF REQUESTED

For all of the above-stated reasons, Plaintiffs request that this Court award the following relief:

A.  Declare that Defendants have violated the Wild Free-Roaming Horses and Burros Act by authorizing the Proposed Action to reduce the AML of the Ochoco Herd to 47-57 horses.

B.  Declare that Defendants have violated the Administrative Procedure Act by authorizing the Proposed Action to reduce the AML of the Ochoco Herd to 47-57 horses and approving the EA, Decision, and FONSI.

C.  Declare that Defendants have violated the National Environmental Policy Act by authorizing the Proposed Action to reduce the AML of the Ochoco Herd to 47-57 horses and approving the EA, Decision, and FONSI.

D.  Order the return of any horses that have been removed from the Ochoco National Forest in violation of federal law.

E.  Vacate the Proposed Action and supporting EA, Decision, and FONSI.

F.  Award Plaintiffs their costs, expenses, and reasonable attorney fees, and

G.  Award Plaintiffs any such further relief as may be just, proper, and equitable.

PLAINTIFFS HEREBY DEMAND TRIAL BY JURY IN THIS ACTION AS TO ANY CLAIMS FOR WHICH PLAINTIFFS ARE ENTITLED TO A JURY.

Dated: October 1, 2021

/s/
GEORDIE DUCKLER, OSB #873780
9397 SW Locust St.
Tigard, Oregon 97223
Telephone: (503) 546-8052
Facsimile: (503) 241-5553
geordied@animallawpractice.com

RILEY SAFER HOLMES & CANCILA LLP
BRUCE A. WAGMAN (CSB #159987)
456 Montgomery Street, 16th Floor
San Francisco, CA 94104
bwagman@rshc-law.com
Telephone:   (415) 275-8540
Facsimile:    (415) 275-8551

4851-3135-6405, v. 3