IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| CENTRAL OREGON WILD HORSE COALITION, an Oregon nonprofit corporation; GAYLE HUNT, an individual; and MELINDA KESTLER, an individual, | Case No. 2:21-cv-01443-HL **FINDINGS AND RECOMMENDATION** |

            Plaintiffs,

   v.

TOM VILSAK, Secretary of the U.S. Department of Agriculture, RANDY MOORE, Chief of the U.S. Forest Service. GLENN CASAMASSA, Regional Forester, Northwest Region of the U.S. Forest Service, and SHANE JEFFRIES, Forest Supervisor of Ochoco National Forest of the U.S. Forest Service, in their official capacities.

            Defendants.

_____

HALLMAN, United States Magistrate Judge:

      In this action, Plaintiffs Central Oregon Wild Horse Coalition, Gayle Hunt, and Melinda Kestler ("Plaintiffs") challenge the United States Forest Service's Ochoco Herd Management Plan to remove 78 horses from the Ochoco National Forest. Plaintiffs bring claims for relief under the Administrative Procedure Act ("APA") for the Forest Service's alleged violations of the Wild Free-Roaming Horses and Burros Act ("WHA") and the National Environmental Policy Act ("NEPA"). This matter comes before the Court on both parties' cross motions for summary judgment. ECF 27-28, 30-32. The Court heard oral argument on these motions on January 25,

2023. ECF 34. For the reasons discussed below, the Court recommends that Defendants' Motion for Summary Judgment be GRANTED on all claims and Plaintiffs motion be DENIED.

## BACKGROUND

This action challenges an updated management plan for the Ochoco Herd (the "Herd"), a group of wild horses located in the Ochoco National Forest. Compl. ¶ 1, ECF 1. The plan approves the permanent removal of almost two-thirds of the Herd. Administrative Record ("AR") 12453, ECF 13. The Ochoco Herd resides on 25,434 acres of the Big Summit Territory ("the Territory") within the Ochoco National Forest. AR 11362. The WHA requires the United States Forest Service ("Service") to manage wild horses on federal land by setting a herd's appropriate management level ("AML") and removing horses when a herd exceeds this AML. *See infra* Standards § II.B.

In 1975, the Service set the Herd's original AML at 55 to 65 horses. The updated management plan challenged here revaluated the Herd's AML at 47 to 57 horses. AR 11363. A recent horse survey counted 135 horses in the Ochoco Herd. Thus, the Service plans to reduce the Herd by 78 animals to achieve the new AML. AR 12453. Removed horses go up for adoption or sale, and if that is unsuccessful, the Service destroys them in a humane manner. AR 11376.

The Service supported the updated management plan with an Environmental Assessment ("EA"). AR 11354. Public participation in the process began in November 2015. AR 12450–53. The Service employed an interdisciplinary team of specialists to set the new AML based on what it asserts was the best available science. AR 11383. The Service considered criteria from the BLM Handbook on herd management, which advises agencies to set the AML based on the most limiting habitat factor and avoid overuse of the range. AR 11553. The Service found that forage availability during above-average winters was the Herd's most limiting factor because high

FINDINGS AND RECOMMENDATION – Page 2

snowfall covers much of the available forage, leading to overuse of the small area that is still

accessible. AR 11556. Thus, the Service only considered winters with above-average snowfall

because these placed the relevant limit on the Herd. *Id.*

To determine how much winter forage the horses could use, the Service first mapped the

Herd's winter range. AR 11556. This winter range map represents the area that readily provides

forage for horses during winters of above-average snowfall. AR 11556. The Service used this

area to calculate the Herd's total forage when determining the AML. AR 11564. To draw the

map, the Service looked at four main factors: a previously delineated wildlife winter range, two

years of winter horse surveys during above-average snowfall years, elevation thresholds, and

vegetative communities in compilation with slope aspect. AR 11556. The Service conducted the

two winter surveys throughout the territory during the high snowfall winters of 2008 and 2017.

Through the Surveys and data from the public, the Service noticed the tightest correlation

between winter horse sightings and a 4600' elevation threshold in the territory, which ultimately

led to its final map of the winter range. AR 11558.

After mapping the winter range, the Service determined forage production in pounds per

acre within the boundary. AR 11564. The Service also considered the degraded condition of

riparian areas because this is where horses prefer to graze. AR 11568. Finally, it allocated forage

according to the multiple-use management direction and in consultation with the Oregon

Department of Fish and Wildlife and the United States Fish and Wildlife Service. AR 11568.

Current allowable uses include sheep grazing and wildlife, namely elk and deer. AR 11571.

These calculations led to an allowable cumulative annual utilization of 0–30% for livestock, big

game, and horses combined. AR 11571. The remaining 70% is ungrazed for watershed health.

AR 11571. The Service considered how much of this available forage the horses could use

without degrading riparian areas beyond what the Land and Resource Management Plan allowed. AR 11576. This allocation provided the AML's upper limit of 57 horses. AR 11576.

Horse herds require a minimum size to ensure a genetically variable population. AR 11575. Should a herd fall below this minimum, it can become inbred, harming its genetic health and preservation. AR 11575–76. The Service cited two genetic studies that indicated the Ochoco Herd had low genetic variability. AR 11575–76. It concluded that because the territory could not support a herd large enough to maintain adequate genetic variation, it would introduce new genes from other herds as necessary. AR 11575–76. This means "translocating" mares from genetically similar herds every two to four years. AR 11631. The Service successfully introduced mares to the Ochoco Herd in 2010. AR 11576. Translocating horses for genetic variability is a practice promoted by the National Academy of Sciences' comprehensive report ("the NAS Report") on the WHA. Supp. AR 0099. The Service considers this report a compilation of the best available science on wild horse management. AR 11553.

The Final EA was published in November 2020. AR 11354-662. In the EA, the Forest Service described the purpose and need for a new herd management plan by noting, among other issues, the increased wild horse population over the 1975 AML, as well as a desire to improve the genetic variability of the wild horse herd for long-term sustainability. AR 11364. The Forest Service considered three alternatives to its proposed management plan. *See generally* AR 11376-82. First, it considered a "No Action" alternative ("Alternative 1"). AR 11376. Second, it considered a plan which would set the AML at a population range between 12 and 57 wild horses and allow the Forest Service to manage the herd for an acceptable level of genetic variability ("Alternative 2"). AR 11376-77. Third, the Service considered a plan which would set the AML between 150 and 200 wild horses, with no outside inputs for genetic variability

("Alternative 3"). AR 1177-78. Next, the Forest Service used data and reports prepared by an interdisciplinary team of specialists and the best available science to analyze the affected environment and environmental consequences of each alternative. AR 11383-533.

Based on the EA and the administrative record, on May 7, 2021, the Forest Service issued the Decision Notice – Finding of No Significant Impact ("FONSI"), selecting Alternative 2 (with modifications) for implementation and determining that the effects of the 2020 Territory Plan are not significant. AR 12465, 12467. The FONSI established an AML of 47-57 horses, which is within the AML range of 12-57 horses that the Forest Service analyzed and considered under Alternative 2 in the EA. AR 11434-35; AR 12453. The FONSI also authorized the management of the Territory's wild horse population through consecutive gathers and contraception, authorized actions to improve and maintain genetic variability, and established guidelines for best management practices. AR 12453-55.

After the Service published its EA and FONSI, Plaintiffs filed this case, alleging that the Service failed to take a "hard look" under NEPA at the environmental impacts of the updated Herd Management Plan. Compl. ¶¶ 89-91. Plaintiffs also argue that the Service's decision is a significant action that requires an EIS. Compl. ¶¶ 88, 92. Finally, they allege violations of the WHA's requirements to manage the Herd at the "minimal feasible level" and properly determine a "thriving natural ecological balance" when setting the Herd's AML. Compl. ¶¶ 80-86.[1]

---

[1] Plaintiffs pled three separate claims under the APA, NEPA, and the WHA. Compl. ¶¶ 76-79 (APA); ¶¶ 80-86 (WHA); ¶¶ 87-94 (NEPA). However, the "APA is merely a procedural vehicle for review of agency action; it does not confer a substantive right to be free from arbitrary agency action." *Ninilchik Traditional Council v. Towarak*, No. 3:15-CV-00205 JWS, 2016 WL 1559122, at *15 (D. Alaska Apr. 17, 2016) (citing *Furlong v. Shalala*, 156 F.3d 384, 394 (2d Cir. 1998)). Accordingly, this Court will not separately address the APA claim.

Plaintiffs' prayer for relief includes declaring that the Service has violated the WHA, NEPA, and APA. They ask the Court to vacate the plan, EA, and FONSI. Compl. ¶¶ A–E.

<b>STANDARDS</b>

## I.    Standards of Review

### A.    Summary Judgment

The APA limits the scope of judicial review to the administrative record. 5 U.S.C. § 706 (directing the court to "review the whole record or those parts of it cited by a party"). The scope of review is normally limited to "the administrative record in existence at the time of the [agency] decision and [not some new] record that is made initially in the reviewing court." *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (citation omitted).

A motion for summary judgment may be used to seek judicial review of agency administrative decisions within the limitations of the APA. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994). Generally, the court should grant a motion for summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *City & Cty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (alteration in original) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)). "Thus, the usual standard set forth in Rule 56(c) does not apply." *Scholl v. Mnuchin*, 494 F. Supp. 3d 661, 672–73

(N.D. Cal. 2020) (citations omitted). Nevertheless, "summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Occidental*, 753 F.2d at 770.

> **B.      The Administrative Procedure Act**

All the claims in this case are governed by the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (APA). Under the APA, a federal court "shall ... hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] without observance of procedures required by law . . . ." 5 U.S.C. § 706(2). Under this standard, an "agency must examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). There are four ways an agency's action could be arbitrary and capricious: (1) the agency overlooks an important aspect of a problem, (2) the agency's decision is contrary to the evidence, (3) the agency's decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, or (4) the agency's decision is contrary to the governing law. *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005) (citing *State Farm*, 463 U.S. at 43)*.*

In deciding whether the agency's action complied with the APA, the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *San Luis & Delta–Mendota Water Auth. v. Jewell,* 747 F.3d 581, 601 (9th Cir. 2014) (internal quotation marks omitted). The court's "inquiry must be thorough," but "the standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency." *Id.* (internal quotation marks omitted). "Where the agency has relied on relevant

evidence such that a reasonable mind might accept as adequate to support a conclusion, its decision is supported by substantial evidence." *Id.* (internal quotation marks and brackets omitted). "Even if the evidence is susceptible of more than one rational interpretation, the court must uphold the agency's findings." *Id.* (internal quotation marks omitted). The Ninth Circuit has endorsed summary judgment motions as "an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *City & Cnty. of S.F. v. United States,* 130 F.3d 873, 877 (9th Cir.1997) (quoting *Occidental Eng'g Co. v. INS,* 753 F.2d 766, 770 (9th Cir.1985)).

## II.    Substantive Law

### A.    National Environmental Policy Act

NEPA has two main aims. *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council,* 462 U.S. 87, 97 (1983). It requires agencies to "consider every significant aspect of the environmental impact of a proposed action" and "inform the public that it has indeed considered environmental concerns in its decision-making process." *Id.* (cited by *San Luis Obispo Mothers for Peace v. Nuclear Regul. Comm'n,* 635 F.3d 1109, 1115 (9th Cir. 2011). The Court's role is to ensure that the agency adequately considers and discloses the environmental impact of its action. *San Luis Obispo Mothers for Peace,* 635 F.3d at 1115.

NEPA is a procedural statute, not mandating particular results but requiring agencies to take a hard look at the environmental consequences of their decisions. *Westland Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004). The hard look requirement includes "both a complete discussion of relevant issues as well as meaningful statements regarding the actual impact of proposed projects." *Earth Island*, 442 F.3d at 1172. When reviewing that discussion, courts "ensure that the procedure followed by the Service resulted in a reasoned

analysis of the evidence before it…" *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985). To support their analysis, agencies shall . . . . identify any methodologies used and . . . reference . . . the scien[ce] . . . relied upon" to support these methodologies. *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1159–60 (9th Cir. 2006), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

NEPA mandates the preparation of an Environmental Impact Statement for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11 (2019). An agency may prepare an EA to determine whether the effects of an action will be significant, and if not, the agency may prepare a FONSI and forego preparation of an EIS. *See* 40 C.F.R. §§ 1501.3, 1501.4(c), (e), 1508.9, 1508.13. The EA is a "workable public document that briefly provides evidence and analysis for an agency's finding of environmental impact." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012) (citations omitted). On review, the Court defers to agency conclusions "so long as those conclusions are supported by studies that the agency deems reliable." *Id*.

"Once satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, the review is at an end." *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). The APA does not require perfection. *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003); *Sw. Ctr. for Biological Diversity*, 100 F.3d at 1448 ("gaps and imperfections in the [agency's] analysis . . . do not [always] rise to the level of an arbitrary and capricious decision."). The Court "may only set aside decisions that have no basis in fact, and not those with which [it] disagree[s]." *Forest Guardians*, 329 F.3d at 1099. In determining whether an agency has prepared a "reasonably thorough discussion," the Court may not "fly-speck" the analysis and "hold it insufficient on the basis of inconsequential, technical

deficiencies." *Audubon Soc'y of Portland v. Haaland,* 40 F.4th 967, 984 (9th Cir. 2022) (internal

quotation marks and citation omitted).

B.     **Wild Free-Roaming Horses and Burros Act of 1971**

The WHA is a horse of a different color because it goes beyond procedure. Congress

passed the Act in 1971 to protect horses and burros as "living symbols of the historic and pioneer

spirit of the West." 16 U.S.C. § 1331. It charges the government with protecting wild horses

from capture, branding, harassment, or death "in the area where presently found." *Id.* The

Secretary of the relevant agency is directed to protect and manage herds as "components of

public lands," maintaining wild horse populations on federal land "in a manner that is designed

to achieve and maintain a thriving natural ecological balance." *Id.* § 1333(a). In furtherance of

that aim, the Secretary maintains a current inventory of herds on public lands to determine the

appropriate management levels. *Id.* § 1333(b)(1). The Secretary decides how to keep horses

within that appropriate level with guidance from wildlife agencies and individuals recommended

by the National Academy of Sciences. *Id*. Actions can include removing the horses or other

options such as sterilization. *Id.* The WHA makes no mention of genetic management. *See id.*

If the Secretary finds that a herd has grown beyond the management limit and action is

necessary to remove excess animals, they "shall immediately remove [the horses] from the range

so as to… restore a thriving natural ecological balance." *Id.* §1333 (b)(2). The Secretary may

make this determination "on the basis of all information currently available to [them]." *Id.* Still,

despite the wide latitude afforded by the Act, all management activities must take place "at the

minimal feasible level." *Id.* § 1333(a).

**DISCUSSION**

I.    **NEPA (Claim I)**

Plaintiffs raise three general arguments under NEPA: the Service violated NEPA in setting the Herd's winter range; the Service failed take to take a "hard look" at the Herd's genetics before deciding to gather; and the Service violated NEPA when it failed to prepare an EIS. The Court considers each argument below.

A.    **Winter Range Arguments**

Plaintiffs first argue the Service violated NEPA in setting the Herd's winter range. Specifically, Plaintiffs argue the Service violated NEPA by (1) only using data from two harsh winters to map the range; (2) failing to conduct sufficient surveys and ignoring contradictory data; and (3) setting an AML far below the current horse population; Pls.' Mot. 11-22, ECF 27. For reasons set forth below, this Court concludes that the Service did not violate NEPA in determining the Herd's winter range. Summary judgment should therefore be granted to the Service on Plaintiffs' NEPA claims pertaining to the winter range.

1.    **Relying on Data from Only Two Harsh Winters to Map the Range**

Plaintiffs argue that only using data from two harsh winters was an arbitrary and capricious cherry-picking to support the Service's predetermined decision to remove horses. Pls.' Mot. 14. The Service responds that using only these two years was reasonable because the Service determined winter forage during above-average snowfall years was the most limiting factor affecting the AML. Defs.' Reply 2-4, ECF 31.

An agency takes a hard look when it effectively explains its management decision with scientific studies it deems reliable. *See Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012). NEPA does not mandate any particular outcomes or scientific

methodology, and "agencies are accorded particular deference with respect to scientific issues within their area of expertise." *In Def. of Animals v. U.S. Dep't of Interior*, 909 F. Supp. 2d 1178, 1197 (E.D. Cal. 2012), *aff'd,* 751 F.3d 1054 (9th Cir. 2014) (citations omitted). One technical area agencies are afforded particular deference is "establishing [and revaluating] AMLs[.]" *Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1008 (D. Nev. 2018), *aff'd,* 820 F. App'x 513 (9th Cir. 2020).

However, an agency violates NEPA's hard look requirement when it selectively relies on beneficial data and ignores contrary evidence without explanation. *WildEarth Guardians v. Haaland*, 561 F. Supp. 3d 890, 901 (C.D. Cal. 2021), *appeal dismissed,* No. 21-56316, 2022 WL 2031684 (9th Cir. Feb. 1, 2022) (finding it arbitrary and capricious for the Service to rely on scientific studies while failing to consider or evaluate the contrary data and conclusions within those studies).

Here, the Service relied on the BLM WHA management handbook to set the AML. AR 11553. This handbook is based on scientific studies the Service deems reliable and requires managers to analyze the habitat's most limiting ecological factor when setting the Herd's AML. AR 11553. The Service's experts determined "winter range forage availability during winters of above average snowfall" was the Ochoco Herd's most limiting factor. AR 11417; *see also* AR 11553-64 (a 20-page analysis determining the most limiting factor that examines other ecological factors, including space, water, and cover).

The BLM handbook the Service relies on does not specifically state that the Service should only use data from high snowfall years. *See* AR 11553. However, the Service's experts have provided a reasoned explanation for how high snowfall years are the most limiting factor for the Ochoco Herd. AR 11555-56 (citing a National Research Council discussion of horse

management that states a seasonally cold environment's carrying capacity will vary with snow

cover to support the Service's decision to base the Ochoco Herd's most limiting factor on above-

average snowfall years). Thus, the Service has provided a rational explanation, applying science

it deems reliable to support its decision to model based on high snowfall years. The Court is in

no position to second guess the Service's experts on this issue.

　　　　After the Service concluded that forage in high snowfall years was the most limiting

factor, it used data from 2008 and 2017 because this data was the only official data from years

with above-average snowfall. AR 11558 (stating official horse surveys were conducted in 2008

and 2017). As a result, the Service was not cherry-picking data as plaintiffs argue; instead, it

used the data it had to apply its chosen methodology of analyzing high snowfall years. Thus, this

case differs from *WildEarth Guardians v. Haaland,* where the Service did not adequately explain

why it ignored contrary evidence. It was reasonable for the Service to only analyze reliable data

from high snowfall years, given its conclusion that high snowfall years were the most limiting

factor. Thus, the Service did not violate NEPA's hard look requirement by relying on its experts

to determine that high snowfall years were the most limiting factor and then utilizing official

data from the two most recent high snowfall years.

### 2.　　Winter Horse Surveys and Plaintiffs' Contradictory Evidence

　　　　Plaintiffs also argue the Service first decided where they wanted the winter range and

then conducted cursory surveys of only the most accessible areas within that predetermined

range, while ignoring Plaintiffs' contrary evidence. Pls.' Reply at 4. The Service responds that its

scientific methodology for calculating the winter range, including the surveys, was developed

and approved by agency experts, and that it was not required to consider Plaintiffs' sightings

without supporting data. Def.'s Reply 4.

FINDINGS AND RECOMMENDATION – Page 13

A careful review of the record refutes Plaintiffs' arguments that the Service only conducted surveys within a predetermined winter range or that the surveys were cursory. AR 02672-74, 03425-26, 03283-85 (showing survey locations outside of the winter range for both years' surveys and stating that over 250 hours went into the 2008 survey); Supp. AR. 8420-23 (showing another 2017 survey that explored areas outside the winter range). Additionally, the Service reached out to multiple individuals familiar with the Ochoco heard asking for data on winter horse sightings. AR 04378-84. And the Service did not rely exclusively on these surveys; rather, it considered them in light of its expert's experience, general knowledge of the Herd and the three other factors it based its winter range determination on (elevation, the wildlife winter range, and vegetative communities/slope aspect). AR 11556–58. The winter range determination is sufficiently supported by the record and the agency's expertise.

Plaintiffs also argue that it was arbitrary and capricious for the Service to use the 2008 winter survey data because it is too old. Pl. Reply at 9 (citing *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1086 (9th Cir. 2011)). But the service did not rely on one stale data set.  Rather, the Service also conducted a more recent survey in 2017, which both corroborated the 2008 survey and provided independent support for the Service's conclusions. Additionally, the Service gathered data from the public, had general knowledge of horse sightings, and examined three other pieces of evidence when delineating the range (elevation, wildlife winter range, and vegetative communities). Thus, this case differs from *N. Plains*, where the agency only relied on one old data set. *Cf. N. Plains*, 668 F.3d at 1086 (agency failed to take a hard look when relying on stale data "[g]iven the dearth of other data" for the agency to rely on).

Plaintiffs finally argue that they provided contradictory data of winter horse sightings, and the Service ignored this information. Pls.' Mot. 13-14; Pls.' Sur. 4-5. Plaintiffs' contradictory information was a map of horse sightings, some of which were outside of the winter range, but this map did not have corresponding dates and GPS coordinates. AR 08164. Plaintiffs submitted this evidence in response to the Service reaching out to them about winter range information. AR 04378, 04522; 04530. The Service informed Plaintiffs that it required dates and GPS coordinates to consider the data. AR 04530. Although Plaintiffs offered to provide this information, they never actually provided it to the service. AR 11678 (email stating Plaintiffs would provide GPS data and dates but had some reservations about providing this information).

The Service explained in its final EA that it did not consider horse survey information that "was either information outside of the Territory, information from average or below average snowfall winters, or opinions or other sources of data without actual data point information." AR 11610. While plaintiffs later objected, because they still failed to provide the information, the objection did not effectively refute the Service's explanation for not using the unsubmitted data. AR 11678. Thus, the Service did not fail to take a "hard look" when it did not consider Plaintiffs' data or respond to Plaintiffs' objections based on that data. *See In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1073 (9th Cir. 2014) (finding the BLM did not need to directly answer a comment's scientific study in their response and could instead point to a general explanation elsewhere in the record).

In sum, the Service provided a sufficient explanation and support for its methodology for assessing the Herd's winter range and declining to consider Plaintiffs' contradictory data.

### 3.    Horse Population Significantly Above AML

Plaintiffs finally argue that the Service's winter range determination was arbitrary and capricious under NEPA because it failed to recognize the contradictory evidence that horses have been surviving at much larger numbers than the AML prescribes. Pls.' Mot. 21-22. The Service responds that this argument is inapplicable because the Service's determination is based on a thriving ecological balance under the WHA and not horse survival. Defs.' Mot. 16, ECF 28.

The EA explains that the Service is determining the AML based on the number of horses that the environment can support while maintaining a thriving ecological balance and that the current levels are leading to riparian habitat degradation. AR 11368, 11401, 11406 (stating riparian conditions are degrading due to horses exceeding the AML). Because the Service's determination is based on a thriving ecological balance, horses could survive but still not meet this standard. *See infra* Standards § II.B. Thus, Plaintiffs' argument that horse survival contradicts the decision to remove horses is misguided.

The Service applied best available science to model the Ochoco Herd's AML based on its most limiting factor—the winter range during high snowfall years. To draw the map, the Service looked at four main factors: a previously delineated wildlife winter range, two years of winter horse surveys during above-average snowfall years, elevation thresholds, and vegetative communities in compilation with slope aspect. Through the Surveys, data from the public, and Service expertise with the Herd, the Service found horses usually remain below the 4600' elevation threshold and used this to map the final winter range. The Service's winter range determination is sufficiently supported by the record and was not arbitrary and capricious.

FINDINGS AND RECOMMENDATION – Page 16

B.    Genetic Management

Plaintiffs next argue that the Service violated NEPA and the WHA by failing to adequately study the Herd's genetics before deciding to gather. Pls.' Mot. 23-24. Plaintiffs argue the Service failed to adequately study genetics before gathering, and therefore violated NEPA, in three ways: failing to evaluate the Herd's genetic makeup and unique characteristics, failing to consider how gathering may make the Herd genetically unviable, and failing to gather necessary baseline data before the Service made its decision. Pls.' Mot. 24-29. The Service responds that the Service has a legal duty to set the AML and gather horses independent of genetic factors and that the decision to gather was not dependent on the genetic determinations Plaintiffs are attempting to incorporate into the analysis. Defs.' Reply 7. The Service also argues that its genetic determinations were supported and reasonable. Def's Reply 11.

The Court finds that the Service did not violate NEPA or the WHA in studying and managing the Herd's genetics for three reasons:[2] (1) Plaintiffs have failed to show how their evidence of genetic uniqueness should alter the WHA's mandate to remove excess horses; (2) the Service sufficiently supported its genetic variability determinations; and (3) the Service's management plans address Plaintiffs' viability concerns. Summary judgment should therefore be granted to the Service on Plaintiffs' claims pertaining to the Herd's genetics.

---

[2] As noted below, Plaintiffs' briefing fails to differentiate between the NEPA claims and the WHA claims. This is especially true with respect to Plaintiffs' arguments concerning genetic management. Plaintiffs argue that the Service failed to take a "hard look" at the Herd's genetics, but also raise substantive claims under the WHA, asserting that the Service was required to consider the Herd's genetics. Despite this lack of differentiation, this Court concludes that Plaintiffs cannot prevail under NEPA or the WHA, and summary judgment should be granted to the Service.

1.    **Genetic Uniqueness**

Plaintiffs have failed to show how genetic uniqueness would alter the WHA's mandate to remove horses to achieve an ecological balance. The Wild Horse Act mandates the Service "immediately remove excess animals from the range to achieve appropriate management levels." 16 U.S.C. § 1333(b)(2). And appropriate management levels are determined "in a manner . . . designed to. . . maintain a thriving natural ecological balance." *Id.* § 1333(a). Thus, when the horse population exceeds its AML leading to an ecological imbalance, the Service must remove horses. *Id.* § 1333(b)(2). The WHA does not mention genetic uniqueness. *Id.* § 1333.

The Ninth Circuit approved a gather plan under the WHA where the agency decided to gather and then monitor a herd's genetic health after it made its gather decision. *See Friends of Animals v. Silvey*, 820 F. App'x 513, 516 (9th Cir. 2020) (approving a gather plan that "include[d] a process to continue to monitor and assess diversity and to mitigate concerns about genetic diversity."). In contrast, if there are Resource Management Plans that regulate a herd's genetic uniqueness, then the agency should consider uniqueness as the applicable resource management plans require. *See Friends of Animals v. U.S. Bureau of Land Mgmt.*, No. 16-CV-0199, 2017 WL 5247929, at *7 (D. Wyo. Mar. 20, 2017) (finding the Service failed to adequately consider gather procedures to preserve genetic uniqueness as herd specific resource management plans required).

Here, the Service is required to set the AML to preserve a thriving ecological balance, and if the Herd exceeds the AML, "immediately remove excess animals from the range." 16 U.S.C. § 1333(b)(2). In arguing that the Service was required to consider genetic uniqueness, Plaintiffs point to the WHA's minimum feasible level requirement and NEPA's requirement to consider environmental consequences. Pls.' Sur. Reply 5-6, ECF 32. But Plaintiffs fail to

articulate what it means to have a genetically unique herd, what legal significance this uniqueness has, and most importantly, how a uniqueness determination would alter the Service's mandate to remove horses once it determines there is an ecological imbalance. There are no resource management plans here that mandate the Service consider the Herd's uniqueness like there were in *Friends of Animals v. BLM,* and Plaintiffs have failed to point to any legal authority requiring the Service to implement such a plan.

Plaintiffs also only cite two sources of scientific information to support their uniqueness argument: a recent reexamination of the 2010 data set from one of the variability studies the Service relied on that concluded the Herd had *some unique ancestry*, AR 04562–76, and at oral argument, Plaintiffs mentioned the NAS Report which found that the Ochoco Herd was the third most unrelated of the 180 existing herds. But the Court is in no position to make a scientific determination regarding whether the Herd is "unique" based on this evidence, nor would the Court be able to attribute legal significance to this uniqueness determination. None of this information resembles the Resource Management plans in *Friends of Animals v. BLM*, which provided specific legal protections for that herd based on the agency experts' uniqueness determination. Plaintiffs have failed to show how these two pieces of scientific information related to uniqueness should alter the Service's mandate to remove horses to achieve a thriving ecological balance under the WHA.

### 2.    Scientific Support to Monitor and Manage Genetic Variability

The Service also has sufficient scientific support for its determination to further monitor and manage the Herd's genetic variability. When analyzing the environmental effects central to the agency's decision, the agency must have reasonable estimates of the baseline conditions relevant to that analysis. *See Great Basin Res. Watch v. BLM,* 844 F.3d 1095, 1101 (9th Cir.

2016) (examining whether the agency's baseline air pollution determinations for an open pit mine "rested on inaccurate information or indefensible reasoning."). When reviewing agency determinations, the Court defers to studies the agency deems reliable and affords the agency particular deference when it is acting in its area of expertise. *Native Ecosystems Council*, 697 F.3d at 1053; *Lands Council*, 537 F.3d at 993.

The Service based its decision on two scientific studies. AR 11394, 11575. Plaintiffs take issue with the Service's studies, arguing they are dated, inconclusive, and use an insufficient sample size. Pls.' Reply 11. However, these two studies independently concluded the Herd lacked genetic variability, and the second study looked at observed heterozygosity,[3] which is a measure not influenced by sample size. AR 02769, 02764.  It is also reasonable for the Service to rely on these two studies because there are no more recent data sets. Plaintiffs have failed to show how the Herd's genetic variation has likely increased since these studies were conducted, and the Service is only relying on these studies to conclude further monitoring is warranted. AR 11418-19. The Service used available scientific information it deems reliable to analyze the baseline genetic variability of the Herd and make a prudent management decision to continue monitoring and managing this variability. Plaintiffs have failed to show that this determination rests on inaccurate information or indefensible reasoning.

---

[3] Observed heterozygosity is a measure of how much diversity is found on average, within individual animals in a wild horse herd. AR 11394. It compares the amount of genetic variation a sample is expected to have under normal breeding conditions against the amount of variation the sample actually has. A mathematical formula assigns a value to this metric. Guidance from the BLM handbook on herd management is that observed heterozygosity below 0.66 is at critical risk for genetic health. This study on the Ochoco Herd provided two values, 0.65 and 0.58. AR 11576.

FINDINGS AND RECOMMENDATION – Page 20

### 3.    The Decision Mitigates the Risk of Genetic Inbreeding

Finally, the Service's approach to continue managing the Herd's variability is a prudent management decision to mitigate the risk of the smaller Herd size and low genetic variability. The Service chose this management alternative because it would allow continued monitoring of the Herd to ensure enough variability to remain healthy despite low numbers. AR 11418-19. Thus, this management decision directly responds to the Plaintiffs' concern about reducing the population size to around 50 horses, which has also previously occurred in the Ochoco Herd. AR 03381 (Stating 2004 census counted 49 horses in the territory); AR 11387-88 (showing horse population over time). The Service relied on scientific studies it deemed reliable and the opinions of its experts to design an alternative to address this concern, and it concluded this alternative "will have a positive effect on the genetic variability of the wild horse herd . . . ." AR 11419.

In sum, the Service concluded it needed to reduce the Herd to achieve a thriving ecological balance under the WHA. It then analyzed the environmental effect of that decision on the Herd's genetic health. To conduct this analysis, it relied on two scientific studies it deemed reliable to conclude that the Herd lacked sufficient variability. As a result, the Service chose to continue monitoring the Herd's genetics to ensure it retained sufficient variability after the gather. Plaintiffs have failed to show that this analysis or management determination violates NEPA's hard look standard or the WHA's management at the minimum feasible level standard.

### C.    EIS Requirement

Finally, Plaintiffs argue that the Service violated NEPA when it failed to prepare an EIS. Under NEPA, an agency must prepare an EIS if the action will have "significant" environmental

effects per Council on Environmental Quality guidelines. *See* 40 C.F.R § 1508.27 (2019).[4]

Agencies evaluate the "context" and "intensity" of the action to determine if it will have

significant effects. *Id.* There are ten factors agencies consider in evaluating intensity, and

Plaintiffs specifically point to four of these factors to argue this project is significant: unique or

uncertain risks, highly controversial, precedential to future decisions, and the likelihood the

action threatens a violation of environmental laws. Pls.' Mot. 29-31. The Service responds that

none of the intensity factors were present. Defs.' Mot. 21. For reasons set forth below, this Court

concludes that intensity factors did not warrant an EIS. Summary judgment should therefore be

granted to the Service on Plaintiffs' claim that the Service was required to prepare an EIS.

### 1.    Unique or Uncertain Risks

Plaintiffs argue that the updated Herd management plan poses uncertain risks because

removing so many horses could decimate the Herd. Pls.' Mot. 29. They argue that a smaller Herd

makes genetic management ineffectual, and that a smaller Herd is more susceptible to external

threats like predation, wildfire, and disease. Pls.' Mot. 29. The Court does not agree that the

project poses enough risk to warrant an EIS.

"NEPA regulations do not anticipate the need for an EIS anytime there is some

uncertainty, but only if the effects of the project are 'highly' uncertain." *Am. Wild Horse

Campaign v. Bernhardt,* 963 F.3d 1001, 1008 (9th Cir. 2020) (finding a horse management plan

was not highly controversial in part because it was "not a new practice, and its effects are well

understood.").

---

[4] Because the project began before CEQ updated these guidelines in 2020, the agency can apply
the repealed regulations to this EA. 40 C.F.R § 1506.13.

Plaintiffs assert that the Herd will be decimated by the Service's management plan. They argue this decimation is likely due to a small herd lacking genetic variability and being vulnerable to outside threats. Pls.' Reply 16. However, as discussed above, the Service's plan to monitor the Herd's genetic variability and introduce mares from outside the territory specifically addresses this issue. See *Supra* Discussion § I.B.3.

To make their external decimation argument, Plaintiffs point to a 1991 genetic study of horses that notes in passing, "[t]here are both extrinsic and intrinsic threats to such small populations. The extrinsic threats include environmental catastrophes, such as drought, or disease." Supp. AR 1743 (Gus E. Cothran's 1991 report on Genetic Conservation and Management of Feral Horses). However, this study does nothing to establish when a population becomes small enough to drastically increase the risk of external decimation, nor does it specifically study the external threats of the Ochoco territory or external threats in general.

The EA examined the gather's effect on the Herd and did not consider decimation worthy of discussion. AR 11407-21 (analyzing the gather's effect on horses and never considering that it could decimate the Herd). Additionally, the Herd was previously at 49 horses once and 60 horses twice. AR 03381 (Stating 2004 census counted 49 horses in the territory); AR 11387-88 (showing horse population over time). The Service analyzed impacts on the Herd throughout the EA and concluded that the project does not pose highly uncertain risks. AR 12466. The record does not support Plaintiffs' contention that setting the AML at the suggested level creates a highly uncertain risk of decimating the Herd.

2.        **Highly Controversial**

Plaintiffs point to the exact same risks backed by the same record citations to argue the project is also "highly controversial." Pls.' Reply 15-18 (arguing "highly controversial" and "uncertain risks" in the same section with the same factual support).

A project is highly controversial" and requires an EIS "if there is a substantial dispute about the size, nature, or effect… rather than the existence of opposition to a use." *Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233, 1240 (9th Cir. 2005). Put another way, an action becomes "highly controversial" when the agency is presented with evidence that "casts serious doubt on the reasonableness of [the] agency's conclusions." *In Def. of Animals,* 751 F.3d at 1070. Plaintiffs argue that there is a dispute over two aspects of the decision —the "effective" population size for genetic management, and whether the Ochoco Herd is genetically unique. Pls.' Reply at 17-18. The Court finds neither makes this project highly controversial.

Again, Plaintiffs point to the NAS Report's conclusion that population sizes larger than 50 horses are necessary to avoid inbreeding to argue the chosen AML is too small. AR 11394. However, the Service explicitly considered the NAS Report's optimal herd size when it decided to manage genetic variability via translocation. Rather than ignore that science, the Service based its management plan on its findings. See *Supra* Discussion § I.B; AR 11418-19. Because the Service made the NAS report central to its analysis and the NAS report supports the Service's decision, the report does not demonstrate a scientific controversy as Plaintiffs argue.

Plaintiffs also argue that there is significant controversy over whether the Herd is "genetically unique." Pls.' Reply at 18.[5] Plaintiffs' evidence for their argument comes from a

---

[5] Plaintiffs again fail to articulate what a unique herd is, demonstrate how it should affect the Service's analysis, or cite evidence that casts doubt on the Service's decision to manage the Herd as a metapopulation. *See supra* Discussion § I.D.

2019 study based on the samples collected in 2010. Supp. AR 04562-76. On review, it appears

that this study found the horses had some interesting ancestry, but it did not conclude that the

Herd is genetically unique. AR 04571. The study also found that "[i]nbreeding already seems to

be impacting these horses" and that the goal for management should be on "maintaining the

health of the herds, gene flow, and the highest form of genetic diversity." AR 04574. Rather than

cast doubt on the reasonableness of the Service's conclusion, this study supports its decision to

add horses from outside the Herd for genetic variability. Plaintiffs additionally cite a finding in

the NAS Report that the Herd is the third most unrelated out of the 180 existing herds. Again, the

Service's decision was based on recommendations from that same NAS Report. Thus, Plaintiffs

do not highlight a "substantial dispute" which casts "serious doubts" on the Service's conclusion.

*In Def. of Animals,* 751 F.3d at 1070.

### 3.    Precedential

Plaintiffs also argue that an EIS is required because the EA will prove precedential to

future horse management decisions. Pls.' Mot. 30. They claim that this plan to manage genetic

variability after further data collection and analysis will provide the same justification for

subsequent management decisions. Pls.' Reply at 18. The Court does not agree.

EAs rarely create binding precedent because they are "usually highly specific to the

project and the locale." *Barnes v. U.S. Dep't of Transp.,* 655 F.3d 1124, 1140 (9th Cir. 2011).

Still, EAs can provide precedent when they have effects beyond the project area. *Native*

*Ecosystems Council v. U.S. Forest Serv. Ex rel. Davey*, 866 F. Supp. 2d 1209, 1230 (D. Idaho

2012) (finding precedent when a project adopted a map that opened land outside the project area

to logging).

This EA was highly specific to the project and the locale. The Service determined that the Herd already had limited genetic variation. AR 11576. This meant that increasing the population size would not improve the situation. AR 11576. The Service further concluded that the Territory could not support a herd big enough to maintain genetic variation. AR 11576. It also found that the Territory was overpopulated and required an immediate gather to rein in excess horses. AR 11382. The Service decided to gather excess horses first and manage the genetic variability based on the specific project and locale. AR 11576. This decision was based on the specific situation of the Ochoco Herd. It does not have effects beyond the Herd, so it does not fit into the *Native Ecosystems* exception and will not prove precedential to future decisions.

### 4.    Threaten Violations of Environmental Protections

Plaintiffs also argue that the decision threatens environmental violations. However, as the other sections of this Findings and Recommendation show, there is nothing inherent in this decision that threatens environmental laws. Thus, none of the intensity factors warrant an EIS. Summary judgment should therefore be granted to the Service on Plaintiffs' claim that the Service was required to prepare an EIS.

## II.    WHA (Claim II)

Plaintiffs next claim that the Service violated the WHA by failing to properly find the true ecological balance and not managing the Herd at the minimal feasible level. Compl. ¶¶ 80-86. Plaintiffs specifically point to the Service's decisions regarding setting the AML, attributing forage to horses, and deciding to manage the Herd's genetics to argue their WHA claim. Pls.' Mot. 12, 21-23 (arguing the Service improperly set the AML by not defining the winter range properly and attributing too much forage to horses); Pls.' Mot. 26 (arguing the Service's

decisions regarding genetic management violate the WHA).[6] For reasons set forth below, and for reasons previously above, this Court concludes that the Service did not violate the WHA in setting the AML. Summary judgment should therefore be granted to the Service on Plaintiffs' WHA claims.

The WHA minimum feasible level mandate does not exist in a vacuum. *In Def. of Animals,* 751 F.3d at 1066. When an agency reasonably determines that an "overpopulation of wild horses . . . threatens[s] the natural ecological balance," it must "immediately" gather. *Id.* Thus, that gather will not violate the minimum feasible level requirement. *Id.*

The Service also has broad discretion under the WHA when setting the AML and removing excess horses. *Id.* at 1065 & n.16 (cited by *Silvey*, 820 F. App'x at 517 for this proposition). Thus, when an agency bases a removal decision on a NEPA-compliant environmental assessment, the resulting decision in setting the AML should generally comply with the WHA. *See In Def. of Animals*, 751 F.3d at 1066 (finding the plaintiff's argument that the agency violated the WHA's minimum feasible level requirement without merit because the agency determined through an adequate NEPA process "that . . . [an] overpopulation of wild horses . . . threatened the natural ecological balance . . . ."). In contrast, agencies cannot remove entire herds of horses without making any determination as to what the thriving natural ecological balance of the area is or whether the horses are in excess. *See Colorado Wild Horse & Burro Coal., Inc. v. Salazar*, 639 F. Supp. 2d 87, 95 (D.D.C. 2009).

_____

[6] Plaintiffs have argued their WHA and NEPA claims in tandem throughout their briefing. To the extent that Plaintiffs intended for any of their NEPA arguments to support their WHA claims or vice versa, that was not clear from their briefing, and the Court rejects these arguments. Plaintiffs had the opportunity to separate and specifically argue their claims, and when separating Plaintiffs claims, the Court interpreted Plaintiffs arguments in the most persuasive fashion it could.

The EA considered three possible AMLs to achieve a thriving ecological balance: no action, an AML of 12-57,[7] and Plaintiffs' advocated AML of 150-200. AR 11376–82. The Service ultimately decided that alternative two achieved the proper balance because it prevented the deterioration of forage during harsh winters. *Id.* at 12457. Because the Service took a hard look when determining the ecological balance and setting the AML, its determination was reasonable and complied with the broad discretion the Service has in setting the AML and removing excess horses.

Plaintiffs also specifically point to the Service attributing forage to horses to support their WHA claim. Pls.' Mot 17-21; Pls.' Reply 12-14. The Court does not find this argument persuasive; the Service has broad discretion in determining the proper ecological balance and allocating forage to different animals outside of horse sanctuary areas. *See In Def. of Animals*, 751 F.3d at 1063, 1065 (holding a plan to set forage for cattle at three times the rate of forage for horses complied with the WHA).

Additionally, the Service provided a reasoned analysis supported by the record for attributing forage to horses. The Service considered riparian habitat because studies show that is where horses primarily forage. AR 11568, 11414. The Service also found horses primarily responsible for riparian degradation because the Herd has gradually grown in population and wildlife and domestic forage have stayed the same while riparian habitat has continued to degrade. AR 11407. The Service further found 58-77% riparian forage utilization in three data monitoring areas in 2018 when no livestock grazed there compared to 71-80% use with livestock

---

[7] Amended in the decision notice for the final 47-57 limit. The initial AML for alternative two considered competing usage of winter forge by big game, but because these animals typically move off range during harsh winters, the Forest Supervisor did not incorporate their usage in their final decision. AR 12456.

in prior years, demonstrating majority use by horses. AR 11407. Finally, the Service raised the AML based on the finding that wildlife leaves the range during the winter and would not compete with horses for forage during the most limiting time. AR 12435. All these facts demonstrate a reasoned analysis that considered competing forage to set the proper ecological balance under the WHA through a NEPA-compliant determination.

Plaintiffs finally argue under the WHA that the Service's decision to manage the Herd's genetics violates the minimum feasible level standard. Pls.' Mot. 26. But the Service decided to manage the Herd's genetics to "protect . . . [these] wild free-roaming horses" from a slow decline of genetic variability. *See* 16 U.S.C. § 1333(a). And the Service's experts came to this conclusion through a reasoned analysis that relied on studies it deemed reliable, which showed the Herd lacked genetic variability. *See supra* Discussion § I.B. Thus, the Service properly exercised its broad discretion under the WHA when setting the AML. Summary judgment should therefore be granted to the Service on Plaintiffs' WHA claims.

## RECOMMENDATION

The Forest Service's Motion for Summary Judgment, ECF 27, should be GRANTED, and Blue Mountains' Motion, ECF 28, should be DENIED.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from Service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

A party's failure to timely file objections to any of these findings will be considered a waiver of that party's right to de novo consideration of the factual issues addressed herein and will constitute a waiver of the party's right to review of the findings of fact in any order or

judgment entered by a district judge. These Findings and Recommendation are not immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment.

DATED May 12th, 2023.

_____
ANDREW HALLMAN
United States Magistrate Judge