TODD KIM, Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division
HANNAH O'KEEFE, Trial Attorney (IL Bar No. 6336475)
Natural Resources Section
CHRISTIAN H. CARRARA, Trial Attorney (NJ Bar No. 317732020)
Wildlife & Marine Resources Section
Ben Franklin Station
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 598-9736 (Carrara)
Fax: (202) 305-0275
Email: hannah.okeefe@usdoj.gov
Email: christian.carrara@usdoj.gov

*Attorneys for Federal Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **CENTRAL OREGON WILD HORSE COALITION, GAYLE HUNT,** and **MELINDA KESTLER,**<br><br>Plaintiffs,<br><br>v.<br><br>**TOM VILSACK,** Secretary of the U.S. Department of Agriculture, **RANDY MOORE**, Chief of the U.S. Forest Service, **GLENN CASAMASSA**, Regional Forester, Northwest Region of the U.S. Forest Service, and **SHANE JEFFRIES**, Forest Supervisor of Ochoco National Forest of the U.S. Forest Service.<br><br>Defendants. | Case No. 2:21-cv-01443-HL<br><br>**FEDERAL DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO FINDINGS & RECOMMENDATION (ECF No. 41)** |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

LEGAL STANDARD ........................................................................................ 1

ARGUMENT ...................................................................................................... 2

   I.   Judge Hallman Correctly Rejected Plaintiffs' NEPA Claims. ........................... 2

     A.  Judge Hallman Correctly Determined that the Forest Service Did Not Violate NEPA in Defining the Herd's Winter Range.................................................................... 3

     B.  Judge Hallman Rightly Determined that an Environmental Impact Statement is Neither Necessary Nor Required Because the 2020 Territory Plan will Not Have a Significant Effect on the Environment. ........................................ 8

       1.  The Plan Poses No Unique or Uncertain Risks. .......................................... 9

       2.  The Plan Is Not Highly Controversial Because There Is No Controversy That Increasing Genetic Diversity Will Improve the Herd's Genetic Health. .................... 10

       3.  The 2020 Territory Plan Will Not Establish Binding Precedent Because Its Analysis Is Highly Fact Specific. ............................................................ 11

   II.  Judge Hallman Correctly Found the 2020 Territory Plan Complies with the Wild Horse Act.................................................................................................... 12

     A.  The AML Set by the 2020 Territory Plan Satisfies the Wild Horse Act. .................... 12

     B.  The 2020 Territory Plan's Consideration of Genetics Satisfies the Wild Horse Act. .. 16

       1.  Judge Hallman Correctly Rejected Plaintiffs' Argument that the 2020 Territory Plan Alters the Herd's Genetic Composition in Violation of the Wild Horse Act............ 17

       2.  Plaintiffs' Contention that the Wild Horse Act Requires the Forest Service to Consider Genetic Uniqueness is Unsupported by Law. ........................................... 19

     C.  Judge Hallman Correctly Rejected Plaintiffs' Argument that the Forest Service Lacks Necessary Evidence on the Herd's Genetic Variability. ................................. 23

     D.  Judge Hallman Correctly Found the 2020 Territory Plan Sufficiently Addresses Genetic Variability........................................................................................ 25

   III.  Plaintiffs Fail to Show the Forest Service's Determination Has No Basis in Fact....... 25

CONCLUSION.................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page**

*Barnes v. U.S. Dep't of Transp.*,
   655 F.3d 1124 (9th Cir. 2011)................................................................... 11, 12

*Brown v. Roe*,
   279 F.3d 742 (9th Cir. 2002)......................................................................... 2

*Friends of Animals v. Silvey*,
   820 F. App'x 513 (9th Cir. 2020) ................................................................ 22

*Friends of Animals v. U.S. Bureau of Land Management*,
   No. 16-CV-0199, 2017 WL 5247929 (D. Wyo. Mar. 20, 2017)............................ 22

*Friends of Endangered Species, Inc. v. Jantzen*,
   760 F.2d 976 (9th Cir. 1985)....................................................................... 28

*Greenpeace Action v. Franklin*,
   14 F.3d 1324 (9th Cir. 1992)........................................................................ 8

*Honolulutraffic.com v. Fed. Transit Admin.*,
   742 F.3d 1222 (9th Cir. 2014)..................................................................... 11

*Hosp. Mgmt., Inc. v. Preferred Contractors Ins. Co.*,
   2021 WL 2813610 (D. Oregon, July 6, 2021) .............................................. 2, 11

*Jones v. Blanas*,
   393 F.3d 918 (9th Cir. 2004)......................................................................... 2

*Klamath-Siskiyou Wildlands Center v. U.S. Bureau of Land Management*,
   387 F.3d 989 (9th Cir. 2004)....................................................................... 28

*LaFlamme v. FERC*,
   852 F.2d 389 (9th Cir. 1988)........................................................................ 8

*Native Ecosystems Council v. U.S. Forest Serv.*,
   428 F.3d 1233 (9th Cir. 2005)..................................................................... 11

*N. Plains Res. Council, Inc. v. Surface Tranps. Bd.*,
   668 F.3d 1067 (9th Cir. 2011)...................................................................... 6

*Romo v. Barr*,
   933 F.3d 1191 (9th Cir. 2019)..................................................................... 21

*Shrader v. Plumley*,
  778 Fed. App'x 460 (9th Cir. 2019) ............................................................ 1

*United States v. Howell*,
  231 F.3d 615 (9th Cir. 2000) ................................................................. 2, 19

*United States v. Turkette*,
  452 U.S. 576 (1981) ................................................................................ 21

## Statutes

16 U.S.C. § 558a ........................................................................................ 4
16 U.S.C. § 1331 ....................................................................................... 20
16 U.S.C. § 1333 ....................................................................................... 18
16 U.S.C. § 1333(a) ................................................................. 10, 17, 18, 21
16 U.S.C. § 1333(b) ................................................................................... 17
16 U.S.C. § 1333(b)(2) ......................................................................... 18, 21

28 U.S.C. § 636(b)(1)(C) ............................................................................. 1

## Regulations

40 C.F.R. § 1508.27(b) ................................................................................ 9

**INTRODUCTION**

In May 2021, following years of environmental review and public process under the National Environmental Policy Act ("NEPA"), the Forest Service issued a Decision Notice, and a Finding of No Significant Impact, determining the 2020 Ochoco Wild Horse Herd Management Plan ("2020 Territory Plan") would not have a significant environmental effect, and that no further analysis was needed under NEPA. The Forest Service also determined that an overpopulation of horses exists in the Big Summit Territory and that the Appropriate Management Level ("AML") range of 47-57 horses will protect the population of wild horses in a thriving natural ecological balance, as required by the Wild Free-Roaming Horses and Burros Act ("Wild Horse Act").

In his Findings & Recommendation ("F&R"), Judge Hallman found the Forest Service had taken a hard look at the environmental consequences of the 2020 Territory Plan, as required by NEPA. Judge Hallman likewise found that the Forest Service properly exercised its discretion under the Wild Horse Act when setting the AML and managing the herd's genetics.

Plaintiffs' objections to Judge Hallman's F&R are neither supported by the record nor law and should be rejected. The Court should adopt Judge Hallman's F&R, grant Federal Defendants' cross-motion for summary judgment, and dismiss Plaintiffs' claims with prejudice.

**LEGAL STANDARD**

When a party files written objections to a magistrate judge's findings and recommendation, the district court must conduct a de novo review of the proposed findings and recommendation. *Shrader v. Plumley*, 778 Fed. Appx. 460 (Mem), 460 (9th Cir. 2019) (citing 28 U.S.C. § 636(b)(1)(C)). A district court has discretion, but is not required, to consider evidence or arguments presented for the first time in a party's objection to a magistrate judge's

recommendation. *Hosp. Mgmt., Inc. v. Preferred Contractors Ins. Co.*, 2021 WL 2813610 at *1

(D. Oregon, July 6, 2021) (citing *Jones v. Blanas*, 393 F.3d 918, 935 (9th Cir. 2004), *Brown v.

Roe*, 279 F.3d 742, 746 (9th Cir. 2002), and *United States v. Howell*, 231 F.3d 615, 621 (9th

Cir. 2000)). However, the district court must "actually exercise its discretion, rather than

summarily accepting or denying the motion." *Howell*, 231 F.3d at 622.

## ARGUMENT

## I.    Judge Hallman Correctly Rejected Plaintiffs' NEPA Claims.

In contrast to the Forest Service's data-driven, methodological analysis in the

Environmental Analysis ("EA"), Plaintiffs' NEPA objections consist largely of unsupported

factual claims and scattered legal allegations. As in their initial briefing, Plaintiffs focus their

NEPA claims on two issues: (1) they do not agree with (or do not fully understand) the Forest

Service's use of winters with above average snowfall as the most limiting factor driving its

AML forage analysis, and; (2) they believe the Forest Service should have acted to preserve the

herd's alleged genetic uniqueness instead of acting to promote the herd's genetic health over

time. In his F&R, Judge Hallman rightly rejected each of these arguments. Judge Hallman

found that the Forest Service "provided a sufficient explanation and support for its methodology

for assessing the herd's winter range" in its EA. F&R 15,[1] ECF No. 35. And, Judge Hallman

determined that the Forest Service reasonably crafted a plan to "continue monitoring the Herd's

genetics" to ensure the herd remained genetically healthy, even after reducing the herd's

numbers within the new AML. F&R 21. For the reasons set out below, as well as the reasons

established in Federal Defendants' initial briefing, this Court should adopt Judge Hallman's

F&R that the Forest Service met its procedural obligations under NEPA.

---

[1] This brief references the ECF-generated page numbers for court filings.

A.    **Judge Hallman Correctly Determined that the Forest Service Did Not Violate NEPA in Defining the Herd's Winter Range.**

The F&R reveal that Judge Hallman engaged in a thorough and detailed analysis of each of Plaintiffs' winter range arguments. F&R 11-16. Judge Hallman's analysis and conclusions relied on record citations and Ninth Circuit caselaw to conclude that the Forest Service properly defined the winter range and took the requisite hard look in its NEPA analysis. This was certainly not a "superficial review." *See* Plaintiffs' Objections to the Findings and Recommendation at 6, ECF No. 41 ("Pls.' Obj."). Accordingly, Plaintiffs' winter range objections fail.

The Forest Service reasonably determined that "winter range forage availability during winters of above average snowfall inside the Big Summit Territory" was the most limiting factor for its AML analysis. AR_11417. As explained in Federal Defendants' briefing, Fed. Defs.' Reply in Supp. of their Cross-Mot. for Summ. J. at 2-3, ECF No. 31 ("Fed. Defs.' Reply"), identifying the "most limiting factor" for an essential habitat allows federal agencies tasked with assessing wildlife population allowance on federal land—including wild horse allowances under an AML—to maintain a balance between the needs of the habitat and the needs of the wildlife. *See* AR_02678 (Bureau of Land Management Handbook 4700-1, describing the process for relying on the most limiting factor to calculate AML). Here, the Forest Service has long been aware of public concerns that there is insufficient winter forage to support the current wild horse population. *See, e.g.,* AR_03219 (noting the suggestion that the group "focus first on winter forage as it is the most time sensitive subject"); AR_03229 (discussing "the issue of winter starvation of horses and how to prevent/handle that situation"); AR_03251 ("Winter forage" was a priority topic for the Co-chair group to cover); AR_03255 (discussions of limiting winter starvation due to limited winter forage); AR_03263 ("the underlying issue is one of winter

forage"). Thus, it was reasonable and prudent for the Forest Service to conclude that winter range forage availability during winters of above average snowfall inside the Big Summit Territory should serve as the most limiting factor to calculate AML. AR_11364; AR_11367. Such an approach ensures that even in winters of above-average snowfall, there will still be enough forage to support the herd's population, while allowing the Forest Service to meet its allowable use guidelines for the habitat.

Once the Forest Service had identified winters with above average snowfall as the factor placing the most stress on the habitat, the Forest Service gathered reliable data from years with above average snowfall to identify where horses tend to forage during such winters. AR_11392. The EA displays that since 1989, twelve winters are considered years with "above average" snowfall. AR_11418. The Forest Service had collected official survey data[2] in two of those years: 2008 and 2017. AR_11558. The results of those two surveys demonstrated that observed horse use was most closely correlated to the 4,600-foot elevation demarcation in the territory, AR_11557-59, which allowed the Forest Service to identify the elevation threshold above which forage would not be readily available to wild horses during winters of above-average snowfall.[3]

Plaintiffs argue that the 2008 data was flawed because the 4,600-foot elevation threshold "was not an express consideration of the survey until USFS created a post-event record to its

---

[2] Plaintiffs suggest that the 2008 survey was not a "formal" or official survey because it relied on volunteers to collect the data. Pls.' Obj. 7. Not so. Collaborating with volunteers is a regular part of Forest Service practice and is specifically authorized by statute. *See* 16 U.S.C. § 558a ("Volunteers in the National Forests Program").

[3] Plaintiffs' challenges in their Objections regarding the Forest Service's methodology in conducting the 2008 and 2017 surveys—including claims that the surveys are unreliable or improper because they only covered portions of the total territory—rely on new arguments and new evidence in the record not articulated or cited in its previous briefing. *See* Pls.' Obj. 4-7. Accordingly, this Court has discretion whether to consider these arguments here.

benefit." Pls.' Obj. 7. But this objection only highlights the Forest Service's proper methodology: instead of directing surveyors to search only below a certain elevation, the Forest Service allowed the observation data to speak for itself. *See* AR_02670 ("Elevation range of witnessed horse presence ranged from 3800 feet to 4600 feet. No sign of horses was observed above the 4600 foot line."); *see also* AR_11558 ("Results from [the 2008 survey] concluded the repeatable observations [that] horses were not seen above the 4,600' elevation."). The 2008 survey data[4] provided the Forest Service useful information that helped inform their winter analysis in conjunction with the more recent 2017 survey data and information elicited from the public.

Plaintiffs seem to suggest that the 2017 survey data was outdated and that the Forest Service should have used more recent data. However, the 2017 survey was completed specifically for the 2020 Territory Plan NEPA analysis. Indeed, determining the boundaries of the winter range was so fundamental to the Forest Service's AML calculation and NEPA effects analysis that it was one of the first aspects of the analysis completed. *See* AR_03313 (discussing the Big Summit Wild Horse Management Plan Update on February 1, 2017 and noting a need to "determine if there is any additional data that is needed to develop a Proposed Action."). The 2017 survey allowed the Forest Service to begin discussing and drafting the AML analysis in December 2018, AR_04556-58, for an EA ultimately published in November 2020. AR_11354. Thus, the Forest Service complied with NEPA by gathering new, up-to-date data to complete its

---

[4] Plaintiffs also question Federal Defendants' assertion at oral argument that the 2008 survey was not random, but rather was completed ahead of planned removals of horses in the territory and characterize this assertion as "outside the record" and "false." Pls.' Obj. 4-5. But while Plaintiffs retort that "no removals occurred for a period of four years" after 2008, Pls.' Obj. 5, the EA itself states that four horses were captured and removed under a Bureau of Land Management contract in 2009 and that eighteen horses were captured and removed in 2010. AR_11390.

NEPA review. *C.f. N. Plains Res. Council, Inc. v. Surface Tranps. Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2011) (finding that an agency violated NEPA for failing to collect baseline data). The Forest Service had no obligation to conduct an additional winter horse survey in 2019 to supplement its two-year-old data. Indeed, if an agency was required to restart its NEPA process to gather additional data each year, NEPA analyses would be unending and impossible to complete.

In addition, Plaintiffs' claim that the 2017 survey was unreliable because photos show "little to no snow in the area" actually undermines Plaintiffs' argument by providing a clear illustration of the ways that wild horses utilize the territory during winters with above average snowfall. Pls.' Obj. 9 (citing AR_03358-80). The photographs Plaintiffs cite were taken at lower elevations of the territory. Thus, even though snow depth was at a peak at higher elevations during that time, AR_04619, the horses found during the survey were located at lower elevations with less snowpack and more available forage.

Plaintiffs also assert that the Forest Services' winter surveys should have taken place "across the entire territory" instead of in specific locations within the territory. Pls.' Obj. 8. But the goal of the analysis was to determine the elevation threshold above which forage would not be readily available to wild horses during winter of above average snowfall. It was thus neither necessary nor feasible for the Forest Service—even with the assistance of volunteers—to inventory every square foot of a forty square mile territory, traveling on skis or snowshoes through multiple feet of snow. AR_02670. Accordingly, the Forest Service directed its surveyors to accessible locations near high elevations. And, the Forest Service supplemented its survey data by requesting data and feedback from members of the public who have information or knowledge on wild horse locations in winter time. *See* AR_11558, AR_04378, AR_04380, AR_04384.

Plaintiffs' objections that the Forest Service ignored contrary evidence are equally unavailing. First, Plaintiffs' claims that the Forest Service ignored summer census data, Pls.' Obj. 11, and that "summer forage was admittedly not in short supply", *id.* 26, reveal Plaintiffs' fundamental misunderstanding of the Forest Services' process in determining the winter range. Summer census data and summer forage availability is entirely irrelevant to the calculation of a winter range, which encompasses the elevation threshold below which wild horses are consistently present during *winters* with above average snow fall. AR_11392.  Likewise, the sightings that Plaintiffs identify outside the winter range, which were purportedly ignored by the Forest Service, largely fall outside the wild horse territory, and are thus equally irrelevant to determining winter range within the territory. AR_08132. And, while Plaintiffs assert that the Forest Service directed its surveyors to search only in the designated big game winter range,[5] the EA directly refutes this claim by noting that the observed horse occurrences from 2008 and 2017 "did not correspond well to the General Forest Winter Range Management Area [the big game winter range] . . . but rather seemed to more closely align with an elevation threshold of 4,600 [feet]." AR_11558.

Finally, Judge Hallman rightly found that the Forest Service provided a sufficient explanation and support for its decision not to consider Plaintiffs' contradictory data. F&R 15. Plaintiffs complain that the Forest Service supposedly ignored winter aerial survey data that they submitted. Pls.' Obj. 10. But as Federal Defendants explained and as Judge Hallman noted, the

---

[5] Plaintiffs also claim that the Forest Service directed surveys to search in the Crystal Springs Allotment, which they falsely claim was "later eliminated from Territory acreage." Pls.' Obj. 9. The Territory boundary in the EA is the same as that originally designed in the 1975 EA. AR_11370. The Crystal Springs Allotment has never been part of the Big Summit Wild Horse Territory. AR_11429-11431.

map that Plaintiffs provided did not have corresponding dates and GPS coordinates, making it unusable for the winter range boundary analysis. F&R 15. Without the date of observation for each sighting or the GPS coordinate, the Forest Service had no way to know if the data of each observation was from a winter of above average snowfall, or whether the sighting was within the territory boundaries. AR_11610. The Forest Service requested that Plaintiffs provide the additional data, but the Forest Service never received the requested supplemental information.[6]

**B.    Judge Hallman Rightly Determined that an Environmental Impact Statement is Neither Necessary Nor Required Because the 2020 Territory Plan will Not Have a Significant Effect on the Environment.**

The Ninth Circuit has held that "[a]n agency must prepare an [Environmental Impact Statement ("EIS")] if 'substantial questions are raised as to whether a project . . . *may* cause significant degradation of some human environmental factor." *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992) (citing *LaFlamme v. FERC*, 852 F.2d 389, 397 (9th Cir. 1988). Here, the EA revealed that the 2020 Territory Plan, including setting the AML at 47 to 57 horses, would not degrade the environment; indeed, the EA revealed the opposite. Lowering the AML and managing the wild horse population's genetic health would *diminish* the environmental degradation that the horses' overpopulation currently causes while allowing the remaining horses to thrive in an ecological balance. *See* AR_11513 (describing the 2020 Territory Plan alternative as having the "greatest expected improvement of long-term vegetation

---

[6] AR_11678-79 shows a Forest Service Rangeland Management Specialist requesting the GPS points and dates that accompanied that accompanied Plaintiff's data. And while Plaintiffs have maintained that they provided the requested information, the Forest Service maintains that it never received the additional data from Plaintiffs. The email screenshot provided in Plaintiff's comments at AR_11678 had the "to" line removed from the email information, making it impossible to ascertain the identity of the person to whom Plaintiff may have sent the additional information. Additionally, the "sent" date on Plaintiff's follow-up email appears to be in a different font than the rest of the email information in the screenshot.

conditions in the Territory"). The Forest Service also properly considered each of the Council on Environmental Quality's ten "intensity factors" (40 C.F.R. § 1508.27(b) (2018)) to determine that its action will not have significant effects. This determination—documented in a Decision Notice and FONSI—was not arbitrary or capricious; it was properly based on the thorough analysis in the EA and supporting materials in the record. AR_12450-88.

### 1.    The Plan Poses No Unique or Uncertain Risks.

Judge Hallman properly concluded that "the record does not support Plaintiffs' contention that setting the AML at the suggested level creates a highly uncertain risk of decimating the herd." F&R 23. In their objections, Plaintiffs still offer no record evidence purportedly revealing a high risk that the herd will be "decimated" by the 2020 Territory Plan. Plaintiffs' claim, without support, that the remaining horses will be "exponentially more susceptible to the potential for mass disasters such as predation, wildfire, and disease" because of the small herd size and risk of "extinction." Pls.' Obj. 19. These allegations are unfounded. The Forest Service carefully studied and documented the effects of the 2020 Territory Plan on wild horses, as well as specific effects associated with the gathers, and found no potential for the management plan to "decimate the herd." *See cf.* AR_11407-421 (discussion of effects to wild horses). Thus, there are no unique or highly uncertain risks that necessitate additional study in an EIS.

Plaintiffs attempt to use an out-of-context statement from Forest Service personnel to argue that the Forest Service knew, but disregarded, a clear risk that the herd will become extinct if the 2020 Territory Plan is implemented. Pls.' Obj. 19. But Plaintiffs misinterpret the email discussion and take Forest Service personnel's words out of context. In the quoted email, Forest Service personnel were discussing the hardships that arise in other territories when a wild horse

population is allowed to grow many times larger than the AML. AR_04699. The Acting Forest

Service Range Manager's comment echoed the findings in the EA: explaining that the "minimal

winter range" in the Ochoco Territory generally does not allow horse herds to grow too large

because there is insufficient forage to support even the current wild horse population. However,

he noted that if "a string of easy winters" occurred—which *may* enable the herd to grow larger

than the AML because less snow equals more available forage—a hard winter could "wreck" the

large population and bring it back in line with the AML. Thus, rather than revealing a known risk

of extinction, the referenced email reveals the inherent risk that a large herd faces in the Big

Summit Territory, where winter forage is minimal and starvation could result from

overpopulation. By managing the horses at a lower AML, the wild horse population would be

relatively unaffected by a "harsh" winter because the AML would be specifically calculated to

allow the horse population to thrive *even in* winters of above average snowfall.

> **2.      The Plan Is Not Highly Controversial Because There Is No
> Controversy That Increasing Genetic Diversity Will Improve the
> Herd's Genetic Health.**

There can be no "controversy over genetic uniqueness" requiring additional study in an

EIS because "genetic uniqueness" is irrelevant to the Forest Service's analysis. As explained in

the EA, determining whether the Ochoco wild horse herd is a distinct and unique population is

outside the scope the NEPA analysis. AR_11368. There is no requirement in the Wild Horse Act

that the Forest Service consider "genetic uniqueness" in its management of wild horses. Instead,

the Wild Horse Act requires the Forest Service to maintain the horse population as part of a

thriving ecological balance. 16 U.S.C. § 1333(a). Accordingly, the Forest Service's stated

purpose and need for the Plan is, *inter alia*, "to improve the genetic variability of the wild horse

herd for long-term sustainability." AR_11364. The Forest Services' decision to focus on genetic

health, as opposed to genetic uniqueness, is reasonable given the language of the Wild Horse Act and is thus entitled to deference. *See Honolulutraffic.com v. Fed. Transit Admin.*, 742 F.3d 1222, 1230 (9th Cir. 2014) (internal citations omitted) ("Courts evaluate an agency's statement of purpose under a reasonableness standard [] and . . . *must consider the statutory context of the federal action at issue*.") (emphasis added).

Further, there is no controversy in the scientific record that low genetic variability can lead to lowered resilience, increased expression of recessive traits, reduced fitness associated with inbreeding, and a compromised ability of the herd to persist under changing environmental conditions. AR_05122; *see also* AR_04564 ("Decreased genetic diversity can subsequently lead to inbreeding, lower fitness, and ultimately to herd extinction"). Because the action is not highly controversial,[7] the Forest Service need not prepare an EIS. *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005) ("A project is 'highly controversial' if there is a 'substantial dispute [about] the size, nature, or effect of the major Federal action *rather than the existence of opposition to a use.*'") (emphasis added and citation omitted).

### 3. The 2020 Territory Plan Will Not Establish Binding Precedent Because Its Analysis Is Highly Fact Specific.

Judge Hallman correctly noted that "EAs rarely create binding precedent because they are 'usually highly specific to the project and the locale.'" F&R 25, quoting *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1140 (9th Cir. 2011). Here, as Judge Hallman noted, the Forest

---

[7] Plaintiffs' objections also assert, for the first time, that the action was highly controversial because the Plan does not monitor for "allelic richness." Pls.' Obj. 20. The Court need not consider this new argument. *Hosp. Mgmt., Inc.*, 2021 WL 2813610 at p*1. However, even if the Court considers this argument, the EA does not foreclose the possibility of monitoring allelic diversity as part of its plan to manage genetic health; it only asserts that the current data on allelic diversity are not reliable due to the small sample size. AR_11394. However, the Forest Service explained that they could still determine that genetic variability was limited and in need of ongoing genetic management based on other collected data and studies. AR_11632.

Service's EA was "highly specific" to the facts before it. It was developed based on survey data of wild horses in its territory, AR_11558, grew out of years of engagement with local stakeholders, AR_11536-37, and plans to incorporate ongoing genetic management based on the results of genetic testing of wild horses removed from the herd. AR_11377-78. Plaintiffs' objections are nothing more than speculation and unfounded accusations of a larger objective to "maintain[]… herds at below-viable numbers." Pls.' Obj. 22. Congress has tasked the Forest Service with maintaining a thriving, healthy herd of wild horses; thus, the Forest Service has no incentive to act in a way that threatens the health of the herd, let alone rely on such actions to set agency precedent. In sum, the Forest Service reasonably concluded that the 2020 Territory Plan would not have a significant effect on the human environment and no additional NEPA analysis is necessary. Accordingly, Plaintiffs' NEPA claims fail.

## II.    Judge Hallman Correctly Found the 2020 Territory Plan Complies with the Wild Horse Act.

With respect to the Wild Horse Act, Plaintiffs argue just as they unsuccessfully did before Judge Hallman: that the 2020 Territory Plan improperly calculated the AML, unlawfully alters the herd's genetic composition, and "lacks necessary evidence" of the herd's genetic variability and fails to address Plaintiffs' genetic health concerns.  Pls.' Obj. 13-18. But Plaintiffs' objections are not only unsupported—they are belied—by fact and law. As Judge Hallman correctly found, the Forest Service reasonably calculated the AML and considered genetic variability in the 2020 Territory Plan. F&R 16, 35. The Court should therefore overrule Plaintiffs' objections.

### A.    The AML Set by the 2020 Territory Plan Satisfies the Wild Horse Act.

Plaintiffs' objections to Judge Hallman's finding that the Forest Service reasonably calculated the AML, F&R 16, can be distilled into three arguments. First, Plaintiffs assert the

Forest Service does not have an accurate record of past herd populations. Pls.' Obj. 12. Second, they assert that the Forest Service's historic records show populations of past herds have been large, so degradation of habitat cannot be from the increased size of the herd now. *Id*. And, third Plaintiffs contend the Forest Service has not studied the impact predators have on horses in setting the AML. *Id*. 12-13. Thus, Plaintiffs argue, the Forest Service's AML determination is arbitrary and capricious by failing to consider this information. *Id*. But Judge Hallman already considered these arguments and correctly rejected them.

As explained in the F&R, "[t]he EA examined the gather's effect on the Herd and did not consider decimation worthy of discussion" because of how unlikely it is to occur. F&R 23 (citing AR_11407-21). Indeed, Judge Hallman noted that some of the historic herd population numbers were similar to the AML set under the 2020 Territory Plan—49 horses in 2004 and 60 horses in 2005 and 2006, *see id*. (citing AR_03381, AR_11387-88)—and the EA concluded that the project does not pose highly uncertain risks to the herd in setting the AML to 47-57 horses. *Id*. (citing AR_12466). Likewise, Judge Hallman considered Plaintiffs' argument that a smaller herd is "more susceptible to external threats like predation" and again found the 2020 Territory Plan addresses possible threats of decimation to the herd. *Id*. 22-23. And concerning forage utilization, the F&R found the Forest Service provided a "reasoned analysis supported by the record for attributing forage to horses" and highlighted the various data and studies the decision relied upon. *Id*. 28-29. Thus, Judge Hallman reasonably concluded "[t]he record does not support Plaintiffs' contention that setting the AML at the suggested level creates a highly uncertain risk of decimating the Herd." *Id*. 23.

Plaintiffs fail to identify a defect in this finding or show that the Forest Service's AML determination was unreasonable. Plaintiffs argue that a calculation shows that extinction should

have occurred based on the Forest Service's historic data, however, the record provides no support for Plaintiffs' assertion. Pls.' Obj. 11. The pages Plaintiffs cite only show herd population growth and removal data; not calculations—or even suggestions—of the herd's extinction. *See cf.* AR_11390 (capture and removal data for the territory); AR_11907 (Spreadsheet: wild horse population growth accounting for gathers and deaths). In fact, Plaintiffs rely upon their earlier briefing, but that shows nothing more than conclusory statements. *See, e.g.*, Pls.' Obj. 12 (citing ECF No. 30 at 20, which concludes, "[a]t a 20% growth rate, the herd would have vanished after the winter of 1992-1993").[8] By contrast, as the record shows and Judge Hallman acknowledged, the Forest Service reasonably determined that the 2020 Territory Plan would not risk decimation of the herd. *See* F&R 22-23 (finding the record does not support Plaintiffs' contention that the AML creates a highly uncertain risk of decimating the herd); Fed. Defs.' Opening Br. 28-29, ECF No. 29 (explaining there is "no potential for the management plan to 'decimate the herd'"). Plaintiffs have failed to rebut this.[9] The Court should therefore reject Plaintiffs' specious argument.

Plaintiffs' assertions that "the Herd's population has ebbed and flowed over time" showing that predators are impacting their numbers and that wild horses "are [not] to blame for the worsened riparian conditions," are likewise ineffective. Pls.' Obj. 11-12. Judge Hallman

---

[8] Indeed, this is purely speculation. Plaintiffs cite to their reply brief for this assertion; however, it merely provides this assertion with no support either. ECF No. 30 at 20. Moreover, Judge Hallman addressed the lone study that Plaintiffs appear to generally rely upon for their decimation argument, finding the study "does nothing to establish when a population becomes small enough to drastically increase the risk of external decimation, nor does it specifically study the external threats of the Ochoco territory or external threats in general." F&R 23.

[9] Federal Defendants note that Plaintiffs both rely on the Forest Service's historic population data to argue a larger herd existed in the past, Pls.' Obj. 11, and assert "that the USFS had never known how many horses reside within or near the present-day Territory." *Id.* 12. The Court should reject these hypocritical arguments.

found the Forest Service "provided a reasoned analysis supported by the record for attributing

forage to horses" by considering studies showing forage utilization by horses, comparing herd

growth with other wildlife and their effect on riparian conditions, and different riparian forage

utilization rates across the Territory. F&R 28-29 (citing AR_11568, AR_11414, AR_11407,

AR_12435). Tellingly, Plaintiffs do not engage with Judge Hallman's findings or the data.

Rather, Plaintiffs seem to speculate that larger herd populations in the past should have resulted

in degraded riparian conditions and herd health, thus, the lack of evidence of such proves that

horses cannot be responsible for resource degradation now. Pls.' Obj. 12. But the studies cited by

Plaintiffs undercut these theories. *See id.* (citing AR_11390, AR_11907). Those studies show

that when herd numbers peaked in the past, gathers were conducted. *Compare* AR_11907

(showing horse numbers reaching 137 in 1983); *with* AR,_11390 (stating between 1981-1984,

100 horses were gathered). And it was not until 2012 that the herd population was consistently

over 100 horses. AR_11907. Thus, the record contradicts Plaintiffs' assertion that population

numbers were continuously high. Moreover, Plaintiffs fail to rebut the extensive evidence

considered by the Forest Service in attributing forage to the overpopulation of horses. *See, e.g.*,

Fed. Defs.' Opening Br. 32-36 (considering the horse population doubled since 1975, usage of

riparian areas within the wild horse winter range, the herd's frequent presence in riparian areas,

studies showing riparian usage from 2005-2015, studies and evidence on diminished herd health

resulting from smaller quantities of forage, and the presence and forage consumption by other

wildlife). Thus, even if Plaintiffs' assertion were true (which it is not), Plaintiffs fail to refute the

considerable evidence that supports the Forest Service's determination.

   Similarly, Plaintiffs' assertion that there has been no study of the potential impact of

predation on the herd is belied by the record. Pls.' Obj. 12-13. The Forest Service considered that

prior to 1971, horse numbers were "kept at approximately 60 head by local horse chasers, natural deaths and predators." AR_00022; *see also* AR_00013-14 (stating cougars, wolves, black bears, and coyotes were spotted on the horse range historically). The Forest Service acknowledged that there are black bears and cougars in the Territory, but noted there are "few personal observations" of them killing wild horses. AR_11388. The Forest Service also explained there have been "no confirmed cases of predation to date within the [Territory], but predation is known to occur in other areas where wolves and horses overlap." AR_11443. The Forest Service acknowledged, however, that it would be difficult to determine if horses could become a substitute prey base for wolves, and that wolves may instead follow their more typical diet of deer and elk off the Territory. AR_11443. Therefore, in setting the AML, the Forest Service carefully noted that "there is little evidence of predation on the herd as a factor affecting population growth." AR_11388. And based on this evidence, the F&R agreed that predation did not pose enough risk to warrant an EIS. F&R 22. Yet Plaintiffs again fail to even address these findings. *See cf.* Pls.' Obj. 12-13. Instead, they simply assert "no one could legitimately deny that predation has, in fact, had an effect on wild horse population growth rates in the Ochoco National Forest." *Id.* 12; *see also id.* 12-23 (suggesting, without support, there is "credible evidence before the Court" of predation). The Court should overrule such hollow objections.

**B.    The 2020 Territory Plan's Consideration of Genetics Satisfies the Wild Horse Act.**

The Forest Service considered genetic variability as it relates to genetic health pursuant to its requirement under the Wild Horse Act to maintain a thriving natural ecological balance. 16 U.S.C. § 1333(a). In doing so, the Forest Service relied on expert studies applied to data specific to the Territory and determined that the data indicated the measure of genetic diversity, on average, within individual horses in the herd is at a critical level. AR_08002; AR_11394.

Consistent with those studies, the Forest Service acknowledged that reduced genetic diversity can result in herds suffering from reduced fitness associated with inbreeding but recognized that no single territory could have a minimal viable population size to avoid inbreeding depression for the long term. AR_08002; AR_11394. In response, the 2020 Territory Plan requires the Forest Service to take steps to document the herd's genetic variability in coordination with experts, including "establish[ing] current variability by sampling a portion of the herd during initial gather and removal operations" and continuing sampling during subsequent gather operations to monitor genetic variability over time. AR_12454. Under the Plan, the Forest Service would then analyze the results of the sampling, in coordination with experts in the field, and introduce new mares from herds with complementary genetics, as needed to sustain the Territory's wild horse population. AR_12454. These actions would be taken while the Forest Service attains the AML range established under the 2020 Territory Plan, consistent with the Wild Horse Act's requirement to remove excess horses and maintain a thriving natural ecological balance. 16 U.S.C. § 1333(a),(b). Judge Hallman properly found the Forest Service "came to this conclusion through a reasoned analysis that relied on studies it deemed reliable," and in doing so, "properly exercised its broad discretion under the [Wild Horse Act] when setting the AML." F&R 29.

1.      **Judge Hallman Correctly Rejected Plaintiffs' Argument that the 2020 Territory Plan Alters the Herd's Genetic Composition in Violation of the Wild Horse Act.**

In his F&R, Judge Hallman found that Plaintiffs "failed to show how genetic uniqueness would alter the [Wild Horse Act's] mandate to remove horses to achieve an ecological balance." F&R 18. In rejecting Plaintiffs' argument, Judge Hallman explained that the Act mandates the Forest Service to "maintain a thriving natural ecological balance" by immediately removing horses when the "population exceeds its AML leading to an ecological imbalance." *Id.* (citing

16 U.S.C. § 1333(a),(b)(2)). By contrast, Judge Hallman explained, "[t]he [Wild Horse Act] does not mention genetic uniqueness." *Id.* (citing 16 U.S.C. § 1333)).

Plaintiffs nonetheless object that the 2020 Territory Plan violates the Wild Horse Act by "fail[ing] to 'protect' [the herd] by altering their most basic identities (and adaptations)" which, "necessarily impacts the Herd's health[.]" Pls.' Obj. 13. But as explained previously, the Wild Horse Act does not require the Forest Service to consider "genetic uniqueness;" rather, it requires the Forest Service to maintain a thriving natural ecological balance. Fed. Defs.' Opening Br. 38. In explaining how genetic variability relates to the Act's requirement that the Forest Service maintain such a balance, the Forest Service relied upon the NRC study, which provides "[i]solation and small population size in combination with the effects of genetic drift, may reduce genetic diversity to the point where herds suffer from the reduced fitness often associated with inbreeding." *Id*. And while "[i]t was originally thought that an effective population size of at least 50 was necessary to avoid short-term inbreeding depression," empirical studies suggest that larger population sizes are necessary, and so, no single territory could be considered to have a minimum viable population size for the long term. AR08002; AR_11394. The Forest Service's consideration of genetic variation in this regard satisfied the Wild Horse Act's requirement to maintain a thriving natural ecological balance.

Plaintiffs' reliance on studies in the record to support their genetic uniqueness argument is misplaced. Plaintiffs claim "the Deshpande/Mills study "irrefutably proves the Ochoco Herd to be unrelated to other Oregon wild herds; to be an 'island population'" Pls.' Reply 4, 15. But the study acknowledged that of the "19 herd management areas (HMAs)" established in the State of Oregon, genetic markers were compared with samples from only *six* other HMAs. AR_04564, AR_04567, AR_04569. Moreover, the study concluded that data on the Big Summit population

suggests "a parallel to an 'island population' phenomenon leading to loss of genetic diversity within the herd." AR_04563. Thus, although Plaintiffs seem to suggest that genetic differentiation in this study is indicative of "genetic uniqueness" or "unrelated[ness]," the study indicates it is due to "bottlenecks, founder effects, and genetic drift increas[ing] the risk of a decline in genetic variation." AR_04574.

Plaintiffs also misrely upon the 2013 NAS Report to support their argument.[10] Pls.' Reply 16-17. As Dr. Paul Griffin, Bureau of Land Management Research Coordinator, explained, "[t]he 2013 National Academies of Sciences report included other evidence that shows that the herd in Big Summit WHT is not genetically unique or extremely unusual, with respect to other wild horse herds." AR_12355. Specifically disputing Plaintiffs' reading of Appendix F, Dr. Griffin explained that the Fst values —or measure of genetic differentiation—for samples from the Big Summit Territory samples "suggest that the Big Summit herds [sic] has little genetic differentiation, compared to a number of other federally-managed wild horse herds in California, Oregon, Nevada, and Wyoming." *Id*. Thus, Dr. Griffin concluded the "results support the interpretation that the Big Summit [Territory] wild horses are components in a highly connected metapopulation that includes many wild horse herds." *Id*. Accordingly, Plaintiffs' attempts to rewrite these findings to support their genetic uniqueness argument fails.

### 2. Plaintiffs' Contention that the Wild Horse Act Requires the Forest Service to Consider Genetic Uniqueness is Unsupported by Law.

---

[10] Federal Defendants note that this is the first time Plaintiffs raise these allegations. As previously explained, the Court is not required to consider new allegations at this stage. *Howell*, 231 F.3d at 621-22. But even if the Court considers these allegations, Federal Defendants maintain they lack merit for the reasons discussed herein.

Plaintiffs further object to Judge Hallman's F&R, suggesting that it erred in finding Plaintiffs failed to show how genetic uniqueness alters the mandate under the Wild Horse Act to remove excess horses and maintain a thriving natural ecological balance. Pls.' Obj. 13; F&R 17-18. In fact, Plaintiffs argue "*the answer is apparent* from the plain language of the Act" because it charges the Forest Service with "protecting" wild horses from capture, branding, harassment, or death. Pls.' Obj. 13 (citing 16 U.S.C. § 1331) (emphasis added). Thus, Plaintiffs contend, a "decision to change the genetic makeup of the Herd necessarily impacts the Herd's health, [as it] fails to 'protect' them by altering their most basic identities" in violation of the Wild Horse Act. *Id*. This argument is simply unfounded in law or reason.

Judge Hallman rightly stated in the F&R that the Wild Horse Act does not mention genetic uniqueness. F&R 18. Nevertheless, Plaintiffs now rely upon the statement of Congressional findings and declaration of policy in the Wild Horse Act for support. Pls.' Obj. 13 (citing 16 U.S.C. § 1331). But Plaintiffs fail to explain how the policy to protect wild horses from "capture, branding, harassment, or death" somehow mandates the agency not to alter the herd's genetic identity in order to improve its overall genetic health. Indeed, Plaintiffs merely assert that the decision to change the herd's genetic uniqueness "necessarily impacts the herd's health," but fail to explain how genetic uniqueness—not genetic variation—actually does.[11] Moreover, contrary to Plaintiffs' suggestion that the 2020 Territory Plan could result in the herd's "death," *id.*, the steps taken by the Forest Service with regard to genetic variability are

---

[11] To the extent that Plaintiffs later in their brief assert the herd's genetic uniqueness has resulted in "a thrifty constitution to survive seasons of poor forage" and other attributes that Plaintiffs suggest could affect herd health, Plaintiffs provide no support for this assertion. *See* Pls.' Obj. 17. In fact, the record clearly contradicts it. *See cf.* Fed. Defs.' Opening Br. 34-35 (explaining the herd may be experiencing increased competition for forage, which would result in smaller quantities of forage per animal, poorer body condition, and decreased natality and survival rates).

aimed at maintaining the herd's health and *preventing* individual deaths. AR_12454; Fed. Defs.'

Opening Br. 38-39 (explaining the decision requires the Forest Service to study the herd's

genetic variability in coordination with experts, and then introduce mares from other herds as

necessary to maintain genetic health).

Furthermore, even if Plaintiffs' reading of Section 1331 applied—which it does not—

Plaintiffs still fail to explain "how a uniqueness determination would alter the [Forest] Service's

mandate to remove horses once it determines there is an ecological imbalance." F&R 18-19; *see

also* 16 U.S.C. § 1333(b)(2). As explained previously, Plaintiffs' unsupported interpretations of

the Wild Horse Act would create an illogical result placing genetic uniqueness —whether or not

such uniqueness is beneficial to herd health—ahead of ecological balance, which certainly was

not intended by Congress. *See* Fed. Defs.' Reply at 21-22; *see also* 16 U.S.C. § 1333(a) ("The

Secretary shall manage wild free-roaming horses and burros in a manner that is designed to

achieve and maintain a thriving natural ecological balance on the public lands."); *see also Romo

v. Barr*, 933 F.3d 1191, 1198 (9th Cir. 2019) ("[A]bsurd results are to be avoided and internal

inconsistencies in the statute must be dealt with.") (quoting *United States v. Turkette*, 452 U.S.

576, 580 (1981)).

Plaintiffs' reliance on case law is also unpersuasive. Plaintiffs cite *Friends of Animals v.

U.S. Bureau of Land Management*., No. 16-CV-0199, 2017 WL 5247929 (D. Wyo. Mar. 20,

2017), to argue that the F&R failed to distinguish that decision from the instant matter in

finding that the 2020 Territory Plan did not need to consider genetic uniqueness. Pls.' Obj. 13-

14. In particular, Plaintiffs imply that the holding in *Friends of Animals* requires the Forest

Service to consider genetic uniqueness "when genetic alteration is a guaranteed result of the

intended action." *Id*. This assertion misstates both Judge Hallman's F&R and the decision in

*Friends of Animals*. In discussing the decision, Judge Hallman correctly distinguished the instant action from *Friends of Animals*, explaining, there, "specific resource management plans required" the agency to consider gather procedures to preserve genetic uniqueness. F&R 18. In contrast, here there is no such resource management plan requiring that genetic uniqueness be considered. *Id.* 19. Instead, the circumstances here are akin to *Friends of Animals v. Silvey*, which, Judge Hallman correctly noted, upheld a gather plan that required the monitoring of the herd's genetic health after the gather is completed. *See id.* 18-19 (discussing 820 F. App'x 513, 516 (9th Cir. 2020)). Plaintiffs do not dispute or distinguish Judge Hallman's summary of the *Silvey* holding, nor do they provide any other law to support their objection. In sum, Plaintiffs have failed to show that Judge Hallman's reading of the Wild Horse Act and case law is flawed.

Placing aside legal arguments, Plaintiffs next assert that the 2020 Territory Plan is "wholly illogical" by determining there is an overpopulation of horses in the Territory, which requires the removal of horses, but that it "plans to add other wild horses from other herds." Pls.' Obj. 14. But as Judge Hallman found, there is nothing illogical about this. F&R 28. To the contrary, these actions are eminently reasonable and required by law. As Judge Hallman correctly summarized the 2020 Territory Plan,

> The Service determined that the Herd already had limited genetic variation. AR11576. This meant that increasing the population size would not improve the situation. AR11576. The Service further concluded that the Territory could not support a herd big enough to maintain genetic variation. AR11576. It also found that the Territory was overpopulated and required an immediate gather to rein in excess horses. AR11382. The Service decided to gather excess horses first and manage the genetic variability based on the specific project and locale. AR11576.

F&R 26; *see also id.* 28 (finding the Forest Service exercised its broad discretion under the Wild Horse Act in setting the AML and removing excess horses). Thus, the Forest Service is not removing horses from the herd and simply replacing their numbers with other horses, as

Plaintiffs suggest. Pls.' Obj. 14. Nor has the agency "faila[ed] to fully evaluate the significance of adding outside horses." *Id*. Rather, this approach is calculated to attain the AML set under the 2020 Territory Plan while concurrently analyzing the results of the sampling from the initial gathers, in coordination with experts in the field, and introducing new mares from herds with complementary genetics, as needed to sustain the Territory's wild horse population at the AML. AR_12454. Thus, the plan restores a thriving natural ecological balance by correcting the existing overpopulation of horses and monitoring the herd's genetic health. Plaintiffs fail to show that Judge Hallman erred in determining the Forest Service properly exercised its discretion under the Wild Horse Act in doing so. F&R 29.

### C. Judge Hallman Correctly Rejected Plaintiffs' Argument that the Forest Service Lacks Necessary Evidence on the Herd's Genetic Variability.

Plaintiffs next object to Judge Hallman's finding that the Forest Service sufficiently supported its genetic variation determinations. Pls.' Obj. 15; F&R 17. Specifically, Plaintiffs argue that "there is no recent data on the Herd's genetic composition and there needs to be some collected before the action is taken." Pls.' Obj. 15. But this is the same argument Plaintiffs previously raised and the court rejected. *Compare* Pls.' Reply 11, *with* F&R 20. In rejecting this argument, the F&R correctly found that it was "reasonable for the [Forest] Service to rely on the[] two studies because there are no more recent data sets[,]" that Plaintiffs "failed to show how the Herd's genetic variation has likely increased since these studies were conducted," and that the Forest Service "is only relying on these studies to conclude further monitoring is warranted." F&R 20 (citing AR_11418-19). In response, Plaintiffs speculate that variation in the herd could be different now, Pls.' Obj. 15 ("[t]here may be a difference in genetic variation in certain families . . . simply by virtue of the importation of two South Steens HMA mares"), and offer baseless assertions, *id*. (claiming, without support, that the Forest Service is

"resistan[t] to testing"). But these assertions only undermine their argument, since, if there have been changes in the herd, genetic testing after the initial gather will only better ascertain the current health of the herd. Thus, Plaintiffs fail to rebut the F&R's finding that the 2020 Territory Plan reasonably considers genetic variability. F&R 18-19.

In addition, Plaintiffs seem to assert "[t]he clear evidence was before the Court" that the herd's genetic variation has increased since the Forest Service last conducted studies, and that the Court erred in discounting it. Pls.' Obj. 16 (citing the 2019 Deshpande/Mills study and the 2013 NAS Report). But the F&R considered those studies and explained that they show "[i]nbreeding already seems to be impacting these horses" and informed the Forest Service's decision to monitor genetic variability. F&R 25. Plaintiffs do not dispute this; instead, they *again* assert the herd is genetically unique from other herds and insist that introducing horses from outside the territory would "threaten the thriving natural ecological balance by unbalancing genetic adaptation to their environment." Pls.' Obj. 17-18. This simply misses the mark. Plaintiffs fail to grasp that the 2020 Territory Plan requires the Forest Service to take steps to document the herd's genetic variability in coordination with experts, including "establish[ing] current genetic variability by sampling a portion of the herd during initial gather and removal operations" and continuing sampling during subsequent gather operations to monitor genetic variability over time. AR_12454. Then, based on the results of this sampling, and in consultation with experts in the field, the Forest Service would introduce new mares from herds with *complementary genetics*, as needed to sustain the Territory's wild horse population. *Id*. Thus, the Forest Service is not simply introducing mares that could threaten the herd's health; it is introducing mares—after considerable genetic testing—to maintain the

herd's health. Plaintiffs' objections fail to refute Judge Hallman's finding that this plan

addressed Plaintiffs' concerns related to genetic variability and outside threats. F&R 23.

###### D.    Judge Hallman Correctly Found the 2020 Territory Plan Sufficiently Addresses Genetic Variability.

Plaintiffs further object to Judge Hallman's finding that the Forest Service's decision to

manage the herd's genetic variability through future monitoring is reasonable. Pls.' Obj. 20. In

short, Plaintiffs argue that the decision strains the herd's health—creating "'low numbers' in the

first instance"—which then necessitates genetic monitoring. *Id.* 18. But this argument is

unsupported by the record. Plaintiffs entirely ignore that the Forest Service reasonably

determined that an overpopulation exists and, based on various studies applied to the herd,

found genetic variation is also currently low. Fed. Defs.' Opening Br. 32-34, 38. Thus, Plaintiffs

mischaracterize the Forest Service as creating low numbers by ignoring that the agency is

tasked with removing excess horses in order to maintain a thriving natural ecological balance,

as well as the fact that genetic variation is already low despite the overpopulation of horses. *Id.*

The Court should therefore overrule this baseless objection.

### III.    Plaintiffs Fail to Show the Forest Service's Determination Has No Basis in Fact.

Plaintiffs object that the 2020 Territory Plan has no basis in fact, therefore, no deference

is due to its "manufacture[d] evidence." Pls.' Obj. 22-29. Plaintiffs, however, fail to support

these meritless assertions.

Plaintiffs first appear to argue the Forest Service's finding that an overpopulation exists

has no basis in fact. *See id.* 23 (stating "Defendants knew their overpopulation claim was

false"). This is confounding as Plaintiffs rely on the historic data and claim that some of it

contains "the most accurate counts" of the herd. *Compare* Pls.' Obj. 12, *with* Pls.' Obj. 23.

Indeed, Plaintiffs' own argument highlights the census numbers and other data that were relied

upon in making the determination. *See, e.g.*, *id.* 22-23 (providing numerous citations based on "census numbers," "an intensive volunteer effort," and year-round sightings"). And Plaintiffs even admit that since Plaintiffs have managed the annual herd census for the Forest Service, it "has evolved to be one of the most accurate counts in ten Western states and is probably the most accurate in a forested environment." *Id.* 12. Thus, this argument collapses under its own weight, let alone from the volume of the record. *See* Fed. Defs.' Opening Br. 32-36 (discussing the overpopulation determination). In addition, Plaintiffs cite various years where the numbers of horses in the herd fluctuated to suggest that the current overpopulation determination is inaccurate, but the Forest Service noted that growth rates can fluctuate greatly at times. *See* Fed. Defs.' Reply 21-22 n.9 (explaining growth rates). And, as explained, the Forest Service analyzed the current growth rate based on relevant scientific studies and historic herd population data; it did not rely upon previous growth rates. *Id.* Thus, this objection should be discarded as well.

Plaintiffs' "false statements" arguments are not supported by their assertions concerning wild horse movement off the Territory either. Pls.' Obj. 24. Plaintiffs suggest that because horses leave the Territory to search for food, they cannot be responsible for degrading riparian conditions. This argument misrepresents the record.

First, as previously explained, the fact that horses may depart and then return to the Territory is of little consequence because the Wild Horse Act requires the Forest Service to manage horses within the Territory. Fed. Defs.' Opening Br. 8; *id.* 9 n. 5. Thus, the forage within the Territory must be sufficient for the herd without horses relying on food from outside sources. *Id.* 9 n. 5. Additionally, evidence that horses are leaving the Territory to search for food could very well support the findings that the Territory is overpopulated—and horses are exceeding

forage utilization rates—thus, they are leaving to search for food. *See, e.g.*, AR_11392 (personal observations indicate increased numbers have resulted in increased pressure on horses to attempt to move outside the Territory); AR_11425 ("observed utilization rates throughout the Territory are very high"). Plaintiffs do not address this other possibility. Rather, they offer sweeping conclusions, suggesting the Forest Service made up its findings and the evidence was "clearly contrived." Pls.' Obj. 24-25. But these accusations are not well taken, as Plaintiffs provide few citations to support these claims and those that are provided are simply to their own earlier unsupported briefs. *See Id.* (citing ECF No. 27).

Moreover, Judge Hallman already rejected Plaintiffs' claims that the Forest Service "has made no direct correlation between wild horse numbers and credible evidence of 'resource damage.'" ECF No. 27 at 22; F&R 28 (finding these claims unpersuasive). Judge Hallman explained the process in which the Forest Service found forage availability during above-average winters was the herd's most limiting factor because high snowfall covers much of the available forage. F&R 2-3. He explained that the Forest Service relied upon various studies and directions in addition to conducting surveys. *Id.* 2-4. And in deferring to the Forest Service's use of above-average winters, Judge Hallman concluded, the agency provided a "rational explanation, applying science it deems reliable to support its decision." *Id.* 13. Thus, Plaintiffs have presented no new argument or evidence to show why this finding was in error or that Federal Defendants made false statements. Plaintiffs' objections should therefore be denied.

Next, Plaintiffs claim that the Forest Service skewed the results of its forage calculations by failing to account for the location of every horse in the herd during their winter surveys. Pls.' Obj. 26. But the Forest Service acknowledged in the EA that horses can use areas outside the winter range and that any use is expected to be incidental during winters of above-average

snowfall. AR_12456. And so, the EA's goal was to determine "the area wild horses *primarily*
use during winters with above average snowfall" to use as the foundation for its AML forage
calculations. AR_11392 (emphasis added). And the similarities between the horses' locations in
2008 and 2017 allowed the Forest Service to conclude that although there may be additional, ad-
hoc information about wild horses using areas outside the wild horse winter range during winter,
"forage use of areas outside of the estimated wild horse winter range during winters of above-
average snow fall is expected to be incidental." AR_12456-57. This well-reasoned and well-
explained methodology for calculating the AML is entitled to deference. *See Friends of
Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985) (internal quotations
omitted) (finding that NEPA does not require a court to decide whether an analysis is "based on
the best scientific methodology available," but rather "simply to ensure that the procedure
followed by [the agency] resulted in a reasoned analysis of the evidence before it, and that [the
agency] made the evidence available to all concerned"); *see also Klamath-Siskiyou Wildlands
Center v. Bureau of Land Management*, 387 F.3d 989, 993 (9th Cir. 2004) ("[C]ourts must also
be mindful to defer to agency expertise, particularly with respect to scientific matters within the
purview of the agency.").

        The record also belies Plaintiffs' claims that Federal Defendants misrepresented risks to
the herd by failing to consider the "high probability of predators" causing the herd to go extinct.
Pls.' Obj. 28. In response to comments in the EA, the Forest Service noted that although "horses
have the potential to serve as opportunistic prey for wolves" or other predators, AR_11675, the
Forest Service did not consider predation to present risk of extinction to the herd. This is in line
with the National Resource Council's discussion of the "effects of predation," which concluded
that "the influence of predation on horses in the western United States is considerably limited by

a lack of habitat overlap both with mountain lions and with wolves. Another constraint is that among free-ranging horse populations, foals are the usual prey, and . . . population size is not affected as much by foal survival as it is by adult survival." Supp. AR_0175.

Finally, Plaintiffs claim that Federal Defendants misrepresent the findings of the NAS study as they relate to consideration of the Ochoco Herd as part of a metapopulation of wild horses. Pls.' Obj. 28. But Plaintiffs' objections reveal their own misunderstanding of the meaning of "metapopulation," as used in the EA and throughout the record. In the context of Federal management of wild horses, the NAS report defines metapopulation as "populations that are spatially discreet but connected through nature *or assisted immigration*." Supp. AR_0257 (emphasis added). The NAS report clarifies that it is a theory that "can be used to maintain the level of genetic diversity that is needed for continued survival and reproduction." *Id.* Thus, it is immaterial whether the Ochoco horses have had recent interactions with other horse populations, as Plaintiffs urge.  Pls.' Obj. 29. Metapopulation theory allows for both the "natural *and assisted* movement of animals between HMAs." Supp. AR_0263. Therefore, it was reasonable—and scientifically recommended—for the Forest Service to analyze the Ochoco Herd as part of the metapopulation of wild horses in the West, as it allows the Forest Service to translocate[12] mares between HMAs as necessary to maintain genetically healthy herds.

**CONCLUSION**

---

[12] Plaintiffs incorrectly claim that the Forest Service plans to translocate mares into the Ochoco Herd before doing any genetic monitoring. Pls.' Obj. 18. The Decision Notice clearly describes how the Forest Service will determine the current genetic variability of the herd by analyzing the genetic properties of horses that it already plans to gather *before* it determines whether translocation of an additional mare is necessary. AR_12454; *see* AR_12458 (explaining that the Forest Service will use the genetic sampling from its initial gather "to determine the relatively contemporaneous genetic variability of the herd *prior to determining whether translocation is necessary*") (emphasis added). Thus, this argument fails as well.

The Court should adopt Judge Hallman's F&R, grant Federal Defendants' cross-motion for summary judgment, and dismiss Plaintiffs' claims with prejudice.

Dated:  June 30, 2023                   Respectfully submitted,

                                        TODD KIM, Assistant Attorney General
                                        S. JAY GOVINDAN, Section Chief
                                        BRIDGET K. MCNEIL, Assist. Section Chief

                                        /s/ Hannah O'Keefe
                                        HANNAH O'KEEFE, Trial Attorney
                                        IL Bar No. 6336475
                                        Natural Resources Section

                                        /s/ Christian Carrara
                                        CHRISTIAN H. CARRARA, Trial Attorney
                                        NJ Bar No. 317732020
                                        Wildlife & Marine Resources Section
                                        Environment and Natural Resources Division
                                        United States Department of Justice
                                        Ben Franklin Station
                                        P.O. Box 7611
                                        Washington, DC 20044-7611
                                        Tel: (202) 598-9736 (Carrara)
                                        Fax: (202) 305-0275
                                        Email: christian.carrara@usdoj.gov

                                        Attorneys for Federal Defendants

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **CENTRAL OREGON WILD HORSE COALITION, GAYLE HUNT,** and **MELINDA KESTLER,** | Case No. 2:21-cv-01443-HL |
| Plaintiffs, | |
| v. | **CERTIFICATE OF SERVICE** |
| **TOM VILSACK,** Secretary of the U.S. Department of Agriculture, **RANDY MOORE**, Chief of the U.S. Forest Service, **GLENN CASAMASSA**, Regional Forester, Northwest Region of the U.S. Forest Service, and **SHANE JEFFRIES**, Forest Supervisor of Ochoco National Forest of the U.S. Forest Service. | |
| Defendants. | |

I hereby certify that on June 30, 2023, I electronically filed the foregoing with the Clerk of the Court using CM/ECF. Counsel of record currently identified on the Mailing Information list to receive e-mail notices for this case are served via Notices of Electronic Filing generated by CM/ECF.

**Geordie L. Duckler**
geordied@animallawpractice.com

*/s/ Christian Carrara*
CHRISTIAN H. CARRARA